## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.

JOSEPH R. ISAAC (01),

        Defendant.

Case No. 23-20050-01-DDC

## MEMORANDUM AND ORDER

Defendant Joseph Isaac has filed a Motion to Suppress (Doc. 42), Motion to Dismiss the Indictment (Doc. 40), and Motion to Dismiss Count 1 of the Indictment (Doc. 41). This Order evaluates and rules on each motion, in turn. But first, the court provides the case's procedural history, and then it recites the court's findings of facts.

## I.    Background

Defendant Joseph Isaac was indicted in August 2023 on two charges. In Count 1, the government charged Mr. Isaac with knowingly possessing a machinegun, violating 18 U.S.C. §§ 922(o) and 924(a)(2). Doc. 1 at 1 (identifying charged device as Glock .40 caliber pistol model 27, with serial number PEB668). And in Count 2, the government charged Mr. Isaac as a felon in possession of a firearm under 18 U.S.C. §§ 922(g)(1) and 924(a)(2). *Id.* at 2. The Indictment also outlined Mr. Isaac's previous Kent County, Michigan state court conviction—for armed robbery—to establish his felon status. *Id.*

The court conducted an evidentiary hearing on the Motion to Suppress on April 25, 2025. It continued the hearing to May 28, 2025, to hear the parties' closing arguments. Unless

otherwise noted, the court derives the following factual findings from evidence presented during the hearing.

### *ATF Investigation*

A Bureau of Alcohol, Tobacco, and Firearms (ATF) team—led by Special Agent Kristian Olsen and Kansas City, Missouri Police Department Task Force Officer (TFO) Nick Horine—began investigating Mr. Isaac for illegal firearm possession around June 2022. An anonymous tipster revealed to ATF photos of Mr. Isaac posing with a Glock-style firearm affixed with what appeared as a fully automatic conversion device. From that tip, ATF discovered publicly available social media pages—attributed to Mr. Isaac and others—featuring photos and videos of Mr. Isaac posing with firearms. Special Agent Olsen testified that the firearms appeared real, although some of the posts were edited to obscure certain parts of the photos. From September 2020 to September 2022, more than 30 social media posts showed Mr. Isaac holding firearms. *See* Gov. Hr'g Ex. 1 (summary chart outlining social media posts).

On October 19, 2022, Special Agents Olsen and James Payne noticed Mr. Isaac's vehicle driving down a Kansas City street. The vehicle—a Jeep Grand Cherokee Trackhawk—was distinctive in appearance. Having begun an investigation into Mr. Isaac already, the agents decided to follow his car to a townhome complex in Kansas City, Kansas, near 340 North Coy Street. The agents parked on the street running on the south side of the complex—Splitlog Avenue—to surveil Mr. Isaac. *See* Doc. 63-2 at 1 (Def. Ex. 2) (Google Maps); Doc. 42-5 at 1 (Def. Ex. E) (Google Street View). TFO Horine arrived and assumed the agents' position on the street in front of the complex. He could see the Trackhawk from this vantage point. TFO Horine observed another individual—at the time unidentified—access another car, recover what looked like an AK-style rifle, and get into the passenger seat of Mr. Isaac's Jeep Trackhawk.

The agents and TFO Horine then followed Mr. Isaac to his residence in Parkville, Missouri.  Eventually, the surveillance team followed Mr. Isaac back to 340 North Coy Street. Another ATF Special Agent—Katie Dougherty—also assisted.  The group set up a perimeter in three locations surrounding the townhomes, where one team member could see and narrate what was happening to the others.  TFO Horine parked in the exact same spot he had assumed before following Mr. Isaac to Parkville—a location southwest of the complex on Splitlog Avenue.  *See* Gov. Ex. 3 (video of approximate location where TFO Horine parked).  Mr. Isaac backed the Trackhawk into a parking spot in the corner of that parking lot.

### Coy Street Complex

The townhome complex contained seven multi-family housing units, surrounding a parking lot.  The lot contained just about 19 parking spots.  There were no signs designating the lot as strictly resident parking.  But two signs—one appearing toward the entrance and another toward the back of the lot—asserted that the lot was private property and restricted illegal dumping.  A tree line surrounded the townhome complex.  Townhomes blocked the parking lot on three sides.  And the front of the parking lot was partially blocked by a fence belonging to a neighboring home.  Nothing prevented a member of the public from entering the parking lot, and public sidewalks led to the buildings.

### TFO Horine's Observations

Using binoculars, TFO Horine observed Mr. Isaac cross behind the rear of his vehicle and walk toward its passenger side.  As he did so, TFO Horine spotted a black, Glock-style pistol with a magazine in Mr. Isaac's hands.  The vehicle's passenger door was open,[1] obscuring TFO

---

[1]     TFO Horine originally testified that Mr. Isaac had opened the passenger door.  But TFO Horine had testified earlier before the grand jury that the door remained open after the passenger exited the vehicle.

Horine's view, but then TFO Horine saw Mr. Isaac move a mini-Draco firearm between his hands and access the vehicle again. TFO Horine testified that Mr. Isaac was standing outside the door well when handling the mini Draco. And at another point, he testified, Mr. Isaac held the mini-Draco high enough to see its distinctive muzzle. A mini-Draco is a shorter AK-style firearm.

A large tree partially blocked the corner of the parking lot. And Mr. Isaac's vehicle was parked in the spot closest to the corner. *See* Doc. 63-4 at 1 (Def. Ex. 4) (still of body camera footage showing Trackhawk's parking location and the large tree). At the time of the search, the tree had some leaves, mostly towards its top. *See* Def. Ex. BWC 390 (23:21) (clip showing Trackhawk's passenger door, tree, and TFO Horine's truck). But TFO Horine testified that the tree didn't obstruct his view of the Trackhawk, and there was a clear vantage point between the trees.

TFO Horine advised Agent Olsen that he had seen Mr. Isaac and another individual handling guns near the Trackhawk. And Agent Olsen testified that TFO Horine reported seeing Mr. Isaac in possession of a Glock-type firearm and a miniature AK-47-style pistol. Knowing Mr. Isaac's status as a prohibited person, the surveillance team decided to try to seize the firearm evidence from him. The plan utilized a tactical team from the Kansas City, Kansas Police Department (KCKPD).

### KCKPD Arrives & Special Agent Olsen Determines Probable Cause Exists

About a dozen of Mr. Isaac's associates were present at the townhome when the search occurred. Several of those people were armed. When the KCKPD officers arrived, the people entered the townhome. Multiple people tried to claim Mr. Isaac's vehicle as their own, but KCKPD Sergeant Glenn Carter stopped them. Mr. Isaac also entered the townhome. At this

point, TFO Horine observed a magazine-shaped object and a firearm-shaped bulge in Mr. Isaac's

pocket.  Mr. Isaac didn't have any longer-profile guns with him as he entered the townhome.

TFO Horine concluded that the mini Draco remained inside the Trackhawk.

Concerned that a person might occupy the vehicle still—and unable to tell through the

Trackhawk's dark tinted windows—KCKPD Officer Robert Twitchel used the camera app on his

iPhone to see through the tint.  *See* Def. Ex. BWC 390 (2:57–3:10).  When doing so, he held his

iPhone against the glass.  *Id.*  Sergeant Carter later did the same.  *See* Def. Ex. BWC 141B

(3:05–27).  Doing so, the officers saw guns in the front passenger compartment of the vehicle.

Officer Twitchel observed at least two AR-style rifles.

Special Agent Olsen had determined probable cause existed to search the vehicle without

a warrant.  He based this probable cause determination on the plain view sighting of two firearms

on the front passenger seat of the Trackhawk.  Agent Olsen also knew that TFO Horine had

observed Mr. Isaac holding a Glock-style pistol and miniature AK-47-style firearm near the

vehicle earlier.  And this combination of factors, he reasoned, supported the decision to search

the vehicle.  Doc. 42-3 at 2 (Def. Ex. C) (Special Agent Payne's investigation report).

### *Automobile Search*

The law enforcement team spoke with Mr. Isaac through the screen door of the

townhome, asking if he would open the vehicle for them.  Special Agent Payne informed Mr.

Isaac that the team knew the Trackhawk contained guns.  They then gave Mr. Isaac some time to

speak with his attorney—by telephone—and come to a decision.  Because Mr. Isaac didn't

decide after several minutes, Special Agent Payne used a window punch or baton-style tool to

access the vehicle.  *See* Gov. Hr'g Ex. 7 (showing broken window).

The team recovered four guns from the Trackhawk.  *See* Gov. Hr'g Ex. 9 (showing firearms on passenger side).  Special Agent Payne identified three mini Dracos and one Glock-type handgun.  From start to finish, TFO Horine estimated he observed the parking lot and events there for about seven hours.  *But see also* Doc. 42-1 at 1 (Def. Ex. A) (Olsen report estimating surveillance time from 1:45 to 7:15 P.M.).

The court rules the three pending motions, below.  It begins by evaluating Mr. Isaac's Motion to Suppress (Doc. 42).  Then, the court decides Mr. Isaac's Motion to Dismiss the Indictment (Doc. 40).  Last, the court assesses Mr. Isaac's Motion to Dismiss Count 1 (Doc. 41).  For the reasons explained in each section, the court denies all three motions.

## II.    Motion to Suppress (Doc. 42)

The Fourth Amendment provides for "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. amend. IV.  The ultimate touchstone of the Fourth Amendment is reasonableness.  *United States v. Pacheco*, 884 F.3d 1031, 1040 (10th Cir. 2018).  A court weighs reasonableness by comparing "the degree to which a search or seizure intrudes on a suspect's reasonable expectation of privacy" with "the degree to which the intrusion is necessary to promote legitimate government interests."  *Id.* (citing *United States v. Knights*, 534 U.S. 112, 118 (2001)).

Here, Mr. Isaac asks the court to suppress the firearms seized from the Trackhawk on October 19, 2022.  He argues the search of the vehicle violated his Fourth Amendment rights—the officers needed a warrant to search and seize the firearms recovered from the vehicle.  Doc. 42 at 12.  But the government retorts that the automobile exception justified the search.  Doc. 55 at 9.  Mr. Isaac suggests the automobile exception doesn't apply because (1) Mr. Isaac had parked his Jeep within the curtilage of the apartment complex, so the officers weren't entitled to

enter the lot without a warrant, Doc. 42 at 8; (2) the officers didn't have probable cause to search the Jeep, *id.* at 4, 6; and (3) the firearms weren't in plain view because the officers intentionally touched the vehicle to secure information about what was inside, Doc. 62 at 1.

The court evaluates the curtilage question as a threshold matter to determine whether the officers required a warrant before entering those premises. The government's automobile exception and plain view arguments don't apply if the Jeep was located in the townhome's curtilage.

### A.    Curtilage Protection

The government's primary argument rests on the automobile exception—which permits a warrantless search of a car based on probable cause to believe the car contains contraband. *United States v. Phillips*, 71 F.4th 817, 823 (10th Cir. 2023). But the automobile exception doesn't apply when "a police officer, uninvited and without a warrant" enters "the curtilage of a home in order to search a vehicle parked therein." *Collins v. Virginia*, 584 U.S. 586, 588 (2018). So, whether the government properly may rely on the automobile exception to the warrant requirement depends on whether the townhome parking lot is part of the curtilage.[2]

### 1.    Legal Standard

The court considers the curtilage of one's home "part of the home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180 (1984) (quotation cleaned up). As part of the home, "privacy expectations" in the curtilage "are most heightened." *Florida v. Jardines*, 569 U.S. 1, 7 (2013) (quotation cleaned up). The "central component" defining the curtilage is "whether the area harbors the intimate activity associated with the sanctity of a man's

---

[2]    There's some uncertainty whether Mr. Isaac resided at or owned the townhome. Doc. 55 at 5 (explaining defendant lived at a home in Parkville, Missouri, but was associated with the townhouse in KCK). But the government didn't challenge Mr. Isaac's standing to assert a Fourth Amendment interest in the curtilage of this townhome, so the court doesn't address it.

home and the privacy of life." *United States v. Dunn*, 480 U.S. 294, 300 (1987) (quotation

cleaned up).  Four factors are used to define that "central component":

> (1) the proximity of the area to the house; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the use to which the area is put; and (4) the steps taken by the resident to protect the area from observation.

*United States v. Cousins*, 455 F.3d 1116, 1122 (10th Cir. 2006).  These factors don't supply a

mechanical formula.  Instead, they help describe "whether the area in question is so intimately

tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment

protection."  *Dunn*, 480 U.S. at 301 (quotation cleaned up).  And curtilage is "familiar enough

that it is easily understood from our daily experience."  *Jardines*, 569 U.S. at 7.  So, the court

evaluates next whether the townhouse parking lot at issue here qualifies as protected curtilage.

### 2.    Analysis

The government compares this case to an analysis the undersigned judge conducted in

*United States v. Jones*, 684 F. Supp. 3d 1147 (D. Kan. 2023).  There, the court concluded an

apartment parking lot wasn't part of the curtilage.  *Id.* at 1153.  It reasoned that all four factors

weighed against finding the parking lot curtilage.  *Id.* at 1153–54.  An assessment of the factors

here—while not uniformly favoring the government—justifies a similar conclusion:  the

townhome parking lot was not part of the curtilage.

**(i) Proximity**—The parking lot sits in close proximity to the townhouse.  As defendant

puts it, the parking lot is "steps away from the front door" of the pertinent townhome.  Doc. 42 at

9; *see also* Doc. 42-5 at 1 (Def. Ex. E) (Google Maps satellite image showing parking lot

surrounded by townhomes).  And the parking lot wasn't large—about 19 parking spots total.

Doc. 59 at 39 (Mot. Suppress Hr'g. Tr. 39:18–20).  The relevant townhome is located in the

middle of the parking lot, Doc. 63-2 at 1 (Def. Ex. 2) (Google Maps image), while the

Trackhawk was parked a few spaces away from the townhome, Doc. 63-4 at 1 (Def. Ex. 4) (body

worn camera still shot reflecting Trackhawk parked in leftmost spot). The parking lot at issue in *Jones* was across the street from the defendant's residence—and about 50 feet away—which "suggest[ed] the area doesn't qualify as curtilage." *Jones*, 684 F. Supp. 3d at 1153. But here, the parking lot is "immediately adjacent" to the townhome. *Cousins*, 455 F.3d at 1122 ("The sideyard was immediately adjacent to the house. Thus, the proximity factor suggests this area is curtilage."). Unlike *Jones*, this factor favors Mr. Isaac.

**(ii) Enclosure**—In *Jones*, the parking lot was surrounded by a "man-made barrier and tree line" to the south, a fence to the north, and apartment buildings on the east and west. 684 F. Supp. 3d at 1153. But the court concluded the "parking lot is open, accessible, and entirely visible from a public street." *Id.* at 1153–54. The barriers didn't constitute the type of enclosure qualifying as curtilage. *Id.* at 1154 (first citing *Cousins*, 455 F.3d at 1122; and then citing *United States v. Jenkins*, 124 F.3d 768 (6th Cir. 1997)). Mr. Isaac argues the parking lot here is different, enclosed on three sides by townhomes and a fence on the fourth side. Doc. 42 at 9; Doc. 42-5 at 1 (Def. Ex. E) (Google Street View). While his argument is factually correct, the fence belongs to a different house—not one of the townhomes. Doc. 59 at 87 (Mot. Suppress Hr'g Tr. 87:5–10); Gov. Hr'g Ex. 5 (video of parking lot). But, to Mr. Isaac's credit, the entire property is surrounded by large trees. Doc. 42 at 9; Doc. 42-5 at 1 (Def. Ex. E) (Google Street View). And signs provide that the parking lot is private property—one near the entrance, and another toward the east side of the parking lot. Doc. 59 at 72 (Mot. Suppress Hr'g Tr. 72:18–25).

Ultimately, though, it's evident that anyone could enter the parking lot from the public street—there was no gate or guard. Doc. 59 at 87 (Mot. Suppress Hr'g Tr. 87:15–17); Gov. Hr'g Ex. 5 (Parking lot video). Sidewalks lead from the street to the fronts of the buildings. Doc. 59 at 87 (Mot. Suppress Hr'g Tr. 87:18–20). The court concludes this factor slightly favors the

government.  *See United States v. Jones*, 893 F.3d 66, 72 (2d. Cir. 2018) (concluding common parking lot accessible to tenants of apartment building and "multi-family building next door" wasn't within the curtilage); *United States v. Moore*, No. 23-cr-47, 2024 WL 2543902, at *6 (S.D. Ohio May 24, 2024) (assessing warrant's scope and concluding that apartment parking lot wasn't curtilage where there was a privacy fence and gate, but gate remained open to allow public access at all times).

**(iii) Nature of Use**—Mr. Isaac doesn't address this factor directly, but he does argue that it is "the only parking provided to the people living at the complex."  Doc. 42 at 10.  But there's simply no evidence presented at the hearing or in the papers "suggesting that anyone used the parking lot for 'intimate activities of the home.'"  *Jones*, 684 F. Supp. 3d at 1154 (quoting *Dunn*, 480 U.S. at 302); *Rieck v. Jensen*, 651 F.3d 1188, 1193 (10th Cir. 2011) ("[A] driveway abutting and clearly visible from a public highway is not a suitable setting for intimate activities associated with a home."); *United States v. Vasquez*, No. 22-1294, 2024 WL 34132, at *2, *3 (10th Cir. Jan. 3, 2024) (suggesting objective evidence of "tables, lawn chairs, or a grill" "might suggest that the yard or driveway are used for intimate activity associated with the sanctity of a man's home" and explaining unenclosed shared driveway wasn't curtilage (quotation cleaned up)).  So, this factor also favors the government.

**(iv) Steps Taken by Resident to Protect from Observation**—Mr. Isaac likewise doesn't address this factor, or any steps he personally took to protect the parking lot.  *See generally* Doc. 42.  And, to reiterate the evidence discussed about this test's second factor, the parking lot is visible from the public street.  While designated as private property, the parking lot doesn't restrict parking to tenants.  The parking lot is protected, however, on a few sides by townhomes and some trees.  But that's not enough to constitute protection from observation, much less efforts

Mr. Isaac himself took to protect the parking lot from observation.  *See Rieck*, 651 F.3d at 1193–94 (finding a driveway near the home's gate didn't fall within the curtilage of the home where the gate didn't obstruct the driveway from public view, and "although trees apparently blocked the view of the house and much of the property, they did not block the area in question from observation by those on the public road").  And while Mr. Isaac parked his vehicle in a spot partially obscured from view by a large tree, the parking lot itself was visible from the street.  As discussed in more detail below, the court doesn't find compelling Mr. Isaac's argument that the tree blocked public view of his vehicle entirely.  This final factor thus favors the government.

In sum, three of four factors favor the government—and the ultimate finding that the parking lot is not part of the townhome's curtilage.  In sum, the parking lot at issue isn't "so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection."  *Dunn*, 480 U.S. at 301 (quotation cleaned up).  And Mr. Isaac's reliance on *Collins* doesn't alter that conclusion.

Mr. Isaac likens the parking lot here to the "parking patio or carport" mentioned in *Collins*, which was "'no less entitled to protection from . . . warrantless search than a fully enclosed garage.'"  Doc. 42 at 9–10 (quoting *Collins*, 584 U.S. at 600).  But this argument presupposes the conclusion that the townhouse parking lot is curtilage.  *Id.* (quoting *Collins* for proposition that "*so long as it is a curtilage*, a parking patio" is entitled to protection from a warrantless search (quotation cleaned up) (emphasis added)).  Indeed, *Collins* concluded the carport was curtilage because it sat behind the front of the house, was enclosed on two sides by a brick wall, was accessible through a side door, and visitors would turn off the path toward the front door before they got to the enclosure.  584 U.S. at 593.  As the court's analysis above

reveals, the shared parking lot here—one that serviced several townhomes—is quite different. The parking lot here isn't curtilage, and so doesn't qualify for *Collins*'s rationale.

With that finding in hand, the court now evaluates whether the officers had probable cause to search the vehicle, thus justifying the automobile exception to the warrant requirement.

### B.    Automobile Exception

The automobile exception allows police to search an automobile if they have probable cause to believe there is contraband inside it. *Phillips*, 71 F.4th at 823. "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Id.* (internal citation and quotation marks omitted). To identify probable cause, "an officer 'may draw inferences based on his own experience.'" *United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir. 2002) (quoting *Ornelas v. United States*, 517 U.S. 690, 700 (1996)). Probable cause exists "'where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" *United States v. Brook*, 806 F. App'x 649, 652 (10th Cir. 2020) (quoting *Ornelas*, 517 U.S. at 696).

The government argues probable cause existed to search the vehicle at three discrete points. *First*, it existed when TFO Horine saw the other man—carrying a firearm—enter the vehicle with Mr. Isaac and ride along to Mr. Isaac's residence in Parkville. *Next*, it existed when TFO Horine saw Mr. Isaac handling a Glock-style pistol and mini Draco, but then flee into the townhome without the mini Draco. *Finally*, the government asserts, probable cause existed when Sergeant Carter and Officer Twichel used their iPhone cameras to view several firearms inside the vehicle. Because the court concludes probable cause existed based on the second

argument, the court needn't evaluate whether probable cause existed based on the other two arguments.

The government presented the probable cause facts this way: TFO Horine staked out a vantage point southwest of the pertinent parking lot. He observed—aided by binoculars—Mr. Isaac circle the back of the Trackhawk holding a Glock-style pistol and access the Trackhawk's passenger side. He then watched Mr. Isaac handle an AK-style rifle, known as a mini Draco. TFO Horine and Agent Olsen both knew about Mr. Isaac's prior felony conviction and status as a prohibited person. TFO Horine relayed to his team members that he had spotted Mr. Isaac holding the two firearms. At this point, the team decided to send in the KCKPD tactical unit to try to catch Mr. Isaac possessing those firearms. When KCKPD arrived on the scene, Mr. Isaac and his associates responded by retreating into the townhome. TFO Horine observed that Mr. Isaac no longer had the mini Draco with him as he entered the townhome. Instead, he had a magazine like object and a firearm shaped bulge extending out of his pocket. Throughout the whole investigation, TFO Horine was in contact with and reporting his observations to the surveillance team.

Probable cause to search a vehicle under the automobile exception exists if there's a "fair probability that the car contains contraband or evidence." *Phillips*, 71 F.4th at 823. Based on the government's sighting of the events supported by the evidence, there was a sufficient probability that Mr. Isaac placed the firearms—at least the mini Draco—back in the Trackhawk before he fled into the building. TFO Horine observed Mr. Isaac handle firearms, access the passenger compartment, and later flee into the building without at least one of the firearms. TFO Horine testified to his conclusion that the firearms remained in the Trackhawk. All the while, the law enforcement officers knew Mr. Isaac was a prohibited person.

But Mr. Isaac raises a couple of issues designed to undercut TFO Horine's credibility. *See* Doc. 62 at 3–6. Mr. Isaac questions TFO Horine's ability to observe, highlights inconsistencies in testimony, and challenges TFO Horine's credibility in observing the contents of Mr. Isaac's pockets. Start with TFO Horine's ability to observe the Trackhawk.

Recall that TFO Horine was the sole law enforcement officer to observe Mr. Isaac handling firearms—none of the ATF agents had a sightline. Mr. Isaac argues that TFO Horine fabricated his story—contending that the TFO actually couldn't see Mr. Isaac's activity next to the vehicle because a tree blocked his view. TFO Horine acknowledged the tree's location but testified that he had a clear line of sight from his vantage point on Splitlog Avenue. Doc. 59 at 110 (Mot. Suppress. Hr'g Tr. 110:10–18). And, as TFO Horine testified, there was a gap between the branches of the tree. *Id.*; *see also* Def. Ex. BWC 390 (23:21) (reflecting gap in trees). Based on the exhibits the parties filed, the tree contained leaves but only at the top of the tree—the bottom of the tree appears mostly clear. Def. Ex. BWC 390 (23:21). What's more, TFO Horine testified that his observations spanned several hours. Doc. 59 at 89–90 (Mot. Suppress. Hr'g Tr. 89:24–90:2). It's reasonable to infer that a trained law enforcement officer— tasked as the operation's surveillance eye to relay observations to the rest of the team—would have adjusted his position if he couldn't see the subject's activity in the parking lot. *Id.* at 99 (Mot. Suppress. Hr'g Tr. 99:5–8) (describing role to observe and report observations to team). It's simply not persuasive to reason—as does defendant's argument—that such an officer would continue to sit in a place with a tree completely blocking his view of the vehicle. *See United States v. Pena*, 115 F.4th 1254, 1260 (10th Cir. 2024) ("It is the province of the district court [on motion to suppress] to draw reasonable inferences from diverging evidence."). The court thus concludes based on the evidence that TFO Horine's view—at most—was obstructed by the tree

14

just partially.  The court finds TFO Horine's testimony about seeing through the gap in the trees
is credible.

Mr. Isaac next suggests that the door of the Trackhawk impeded TFO Horine's ability to
see Mr. Isaac allegedly handling firearms.  TFO Horine testified originally that Mr. Isaac opened
the passenger door of the vehicle himself.  Doc. 59 at 77 (Mot. Suppress. Hr'g Tr. 77:17–20).
But cross-examination revealed that TFO Horine had testified before the grand jury that the
passenger door was open already when Mr. Isaac rounded the back of the Trackhawk.  *Id.* at 102
(Mot. Suppress. Hr'g Tr. 102:13–21).  And TFO Horine also testified that he observed Mr. Isaac
holding the Glock-style pistol and then walk behind the passenger door, obscuring his view.  *Id.*
at 77 (Mot. Suppress. Hr'g Tr. 77:17–20).  Mr. Isaac suggests these inconsistencies undermine
TFO Horine's credibility and refute probable cause.

While the court recognizes TFO Horine's initial inconsistency about whether the car door
was open, TFO Horine later acknowledged his grand jury testimony.  *Id.* at 102–03 (Mot.
Supress. Hr'g Tr. 102:16–103:20) (acknowledging the testimony but explaining that it was "a
year and a half ago"—"far enough in the past" to not remember every single word).  And he
conceded that the door was opened—at some point—and obscured his view partially.  *Id.* at 77
(Mot. Suppress. Hr'g Tr. 77:17–20).  But he later explained that Mr. Isaac stood outside the door
well when handling the mini Draco.  *Id.* at 111 (Mot. Suppress. Hr'g Tr. 111:7–18).  What's
more, TFO Horine testified that Mr. Isaac at one point held the mini Draco where TFO Horine
could see part of its distinctive barrel above the door.  *Id.*

It's evident also that TFO Horine was not parked directly south of the vehicle; he was
positioned southwest of the vehicle.  *Id.* at 86 (Mot. Suppress. Hr'g Tr. 86:11–13).  Had TFO
Horine observed the Trackhawk from a surveillance position directly south—and thus looking at

the Trackhawk head-on—perhaps Mr. Isaac's view of the evidence would persuade.  But from a southwest position, TFO Horine was more likely to see Mr. Isaac behind and outside the door well.  The court declines to convert a single statement—that TFO Horine couldn't see behind the door when Mr. Isaac reached into the Trackhawk—as evidence that he couldn't see anything Mr. Isaac was doing at any point near the passenger side of the vehicle.  The court again finds TFO Horine's testimony credible.

Mr. Isaac also suggests the court should reject TFO Horine's credibility because he described Mr. Isaac and his associates *running* to the townhome when KCKPD arrived.  Doc. 62 at 5.  But Officer Twitchel had testified that the individuals *walked* toward the townhome.  *Id.* While the evidence is inconsistent on this narrow point, this inconsistency isn't relevant to the court's probable cause analysis.  The witnesses are consistent that the people in the parking lot fled into the townhome when the KCKPD officers arrived on the scene.  The pace of their flight doesn't alter the court's probable cause conclusion.  And the court declines to conclude that such a difference in verb choice—pertinent only to a minor portion of the testimony—is sufficient to disturb TFO Horine's credibility.  *See United States v. Robinson*, 146 F. App'x 255, 261 (10th Cir. 2005) (citing *English v. Cody*, 241 F.3d 1279, 1285 (10th Cir. 2001) for proposition that "inconsistencies in the [witness's] testimony did not undermine his testimony as a whole"); *United States v. White*, No. 10-CR-0053-CVE, 2010 WL 2365467, at *3 (N.D. Okla. June 8, 2010) (concluding "slight inconsistency" in officers' testimony about traffic offenses didn't "detract from their credibility").

Finally, Mr. Isaac explains that Agent Payne testified to finding a Glock pistol in the Trackhawk during the search.  Doc. 62 at 5.  So, Mr. Isaac implies, TFO Horine's testimony that Mr. Isaac entered the townhome with a firearm-shaped bulge and a magazine-like object

16

protruding from his pocket isn't credible. *See id.* But nothing in Mr. Isaac's brief directs the court to the inference he asks the court to draw from this testimony. And it's not reasonable for the court to infer that TFO Horine fabricated his observations about what Mr. Isaac had on his person when he fled into the house. After all, lying about that information wouldn't bolster the probable cause notion—it would undercut it. Had TFO Horine not seen Mr. Isaac with a firearm shaped bulge and magazine, it would imply that the Trackhawk still contained those items. In short, if TFO Horine had seen Mr. Isaac without any weapons, the "fair probability" that those items were still inside the Trackhawk increases. *Phillips*, 71 F.4th at 823. But if TFO Horine testifies to seeing those items on Mr. Isaac when he enters the townhome—as he did here—it undercuts the likelihood that the Glock-style pistol remains in the Trackhawk, and thus could undercut probable cause. So, the court isn't persuaded by Mr. Isaac's argument about the firearm-shaped bulge and the Glock found in the Trackhawk. His argument doesn't undermine TFO Horine's credibility.

Despite Mr. Isaac's efforts, the court finds TFO Horine's testimony credible based on the available evidence. It doesn't buy his argument that TFO Horine lied about everything he saw and fabricated a basis for probable cause. While there were a few inconsistencies in TFO Horine's testimony, the court is mindful that the events discussed occurred over two years ago. And much of TFO Horine's testimony aligns with testimony by other law enforcement officers. For example, TFO Horine testified that he was reporting his observations to the surveillance team. Multiple witnesses testified that TFO Horine reported spotting Mr. Isaac handling firearms. And Agent Olsen testified that TFO Horine reported those firearms as a Glock-style pistol and a mini Draco. This report came well before the KCKPD officers peered into the

vehicle using their iPhone cameras.  In fact, Agent Olsen decided to contact KCKPD because of TFO Horine's report about firearms.

At bottom, the court finds TFO Horine's testimony credible.  It concludes that the trees and vehicle door just partially obstructed TFO Horine's view.  The court finds that TFO Horine's observations established probable cause:  He spotted Mr. Isaac handle what looked like a Glock-style pistol and a mini Draco, access the vehicle, and then retreat into the townhome without (at least) the mini Draco.  TFO Horine knew Mr. Isaac's status as a prohibited person.  And Agent Olsen—who drew the ultimate conclusion about probable cause—also knew Mr. Isaac's felon status and the information TFO Horine observed.  In sum, there was a "fair probability" that the Trackhawk contained evidence of crime, establishing probable cause supporting the automobile exception to the warrant requirement.  *Phillips*, 71 F.4th at 823.

Because the automobile exception applies, the court denies Mr. Isaac's Motion to Suppress (Doc. 42).[3]

### III.    Motion to Dismiss Indictment (Doc. 40)

Mr. Isaac has moved to dismiss both counts of his Indictment because, he contends, the underlying statutes infringe the Second Amendment.  *See* Doc. 40 at 1.  The court outlines the relevant legal standard on a motion to dismiss before explaining the current state of Second Amendment jurisprudence.  It then evaluates Mr. Isaac's arguments.

---

[3]    Despite the parties' arguments and briefing about whether it was proper for Officer Twitchel and Sergeant Carter to touch the vehicle when using their iPhone cameras to look into the car, the court declines to evaluate these arguments.  The court concludes probable cause existed before these actions occurred and this probable cause hadn't dissipated.  So, the automobile exception applies notwithstanding the arguably improper sighting of firearms achieved by touching an iPhone to the tinted windows.

### A.     Motion to Dismiss Legal Standard

A defendant "may raise by pretrial motion any defense . . . that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). "A court may dismiss an indictment before trial, in whole or in part, for 'failure to state an offense.'" *United States v. Chavez*, 29 F.4th 1223, 1226 (10th Cir. 2022) (quoting Fed. R. Crim. P. 12(b)(3)(B)(v)). "An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges, and enables the defendant to assert a double jeopardy defense." *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (quotation cleaned up). When deciding a motion to dismiss an indictment, the court must accept the allegations in the indictment as true. *Id.* The court thus may grant Mr. Isaac relief only if it determines "'*as a matter of law*, the government is incapable of proving its case beyond a reasonable doubt.'" *Chavez*, 29 F.4th at 1226 (emphasis in original) (quoting *United States v. Hall*, 20 F.3d 1084, 1088 (10th Cir. 1994)). A motion to dismiss doesn't test "the strength or weakness of the government's case, or the sufficiency of the government's evidence." *Todd*, 446 F.3d at 1067.

### B.     Second Amendment Landscape

The Second Amendment constitutionality analysis has shifted in recent years. In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court clarified that the Second Amendment protects the right of law-abiding citizens to keep and bear arms in public for self-defense. 597 U.S. 1, 9–10 (2022). In so holding, the Court adopted a two-part burden-shifting test for Second Amendment constitutional questions. *First*, courts should assess the plain text of the Second Amendment. *Id.* at 17. *Second*, if the Second Amendment covers the relevant conduct, the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Applying the *Bruen* test, the Supreme Court

recently upheld the constitutionality of 18 U.S.C. § 922(g)(8), both facially and as applied to that case's defendant.  *United States v. Rahimi*, 602 U.S. 680, 693 (2024).

     *Bruen*'s first prong assesses the scope of the Second Amendment.  "[I]f the people, weapons, or conduct at issue are outside the Second Amendment's protection, then the government may regulate them without infringing upon the Second Amendment."  *Rocky Mtn. Gun Owners v. Polis*, 121 F.4th 96, 114 (10th Cir. 2024).  Defendant has the burden to establish the first *Bruen* prong.  *United States v. Jackson*, 138 F.4th 1244, 1251 (10th Cir. 2025) ("At the first step, the party asserting the right must establish the plain text of the Second Amendment covers their conduct.").

     The second *Bruen* prong shifts the burden to the government.  *Id.*; *Bruen*, 597 U.S. at 17. And if the regulation at issue falls "within the nation's historical tradition of firearm regulation, it is lawful under the Second Amendment."  *Jackson*, 138 F.4th at 1251 (quotation cleaned up). "Why and how the regulation burdens the right are central to this inquiry."  *Rahimi*, 602 U.S. at 692.  But the government needn't produce a "dead ringer or a historical twin" to satisfy *Bruen*'s second prong.  *Id.* (quotation cleaned up).

     Now, the court evaluates how the *Bruen* inquiry affects Mr. Isaac's arguments—starting with his challenge to Count 1, under 18 U.S.C. § 922(o).

    **C.**    **§ 922(o)**

     Mr. Isaac was indicted under 18 U.S.C. § 922(o)—alleging he possessed a "machinegun[,]" described as a "Glock .40 caliber pistol[.]"  Doc. 1 at 1.  Machineguns are defined as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); 18 U.S.C. § 921(a)(24) (incorporating by reference § 5845(b)'s definition

of "machinegun" into chapter).  Here, Mr. Isaac asserts both facial and as-applied challenges to § 922(o).  *See* Doc. 40 at 1.

The court now applies the first prong of the Supreme Court's *Bruen* test.  In our Circuit, *Bruen*'s first prong consists of three elements:  "(1) whether the challenger is part of the people whom the Second Amendment protects, (2) whether the item at issue is an arm that is in common use today for self-defense, and (3) whether the proposed course of conduct falls within the Second Amendment."  *Rocky Mtn. Gun Owners v. Polis*, 121 F.4th 96, 114 (10th Cir. 2024) (internal quotation marks and citation omitted).  If those three elements aren't satisfied, "the inquiry ends[.]"  *Id.*  Evaluating just two of those three elements, the court concludes the weapon that Mr. Isaac allegedly possessed doesn't fall within Second Amendment protection.  Thus, he didn't satisfy the first *Bruen* prong.  So, the court needn't evaluate the second prong of the test. Mr. Isaac can't succeed on either an as-applied or facial challenge.

### 1.  Persons Protected by the Second Amendment

Take the first of our Circuit's three elements.  Mr. Isaac extensively briefs whether felons, like himself, are part of "the people" protected by the Second Amendment.  *See* Doc. 40 at 3–8.  But the answer to that question is simple.  Unequivocally, our Circuit has explained that "American citizens with felony convictions" are "included in 'the people.'"  *See Rocky Mtn. Gun Owners*, 121 F.4th at 116 (quotation cleaned up); *Jackson*, 138 F.4th at 1252 ("[Defendant's] prior criminal convictions do not exclude him from being a member of the political community.").

### 2.  Arms Protected by the Second Amendment

But Mr. Isaac doesn't fare as well on the second element of our Circuit's test.  He argues that the alleged devices—described by him as a "fully automatic handgun" and "conversion

device"—are "arms" within the Second Amendment's protection. Doc. 40 at 19. He explains that a "fully automatic handgun is obviously an 'arm' that can be used in self defense." *Id.* at 19 (citing *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008)). And, according to Mr. Isaac, the "same reasoning applies to the 'conversion device'" allegedly transforming the Glock handgun into a fully automatic weapon. *Id.* Mr. Isaac concludes both devices are "used for self-defense." *Id.* So, according to him, both charged devices are "arms" with Second Amendment protection. *Id.*

Neither argument avails. For starters, a "machinegun" is a device that "shoots, is designed to shoot . . . automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). And it also includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun[.]" *Id.* It's thus unnecessary to evaluate whether an alleged fully automatic handgun—by itself—or a conversion device—by itself—are "arms." The government charged Mr. Isaac with possessing a machinegun, not either item in isolation. Evaluating the charged device—an alleged machinegun—as a whole, the court concludes it's not an "arm" encompassed by the Second Amendment. Here's why.

"The term 'arms' within the Second Amendment encompasses 'all instruments that constitute bearable arms,' regardless of their existence at the time of the Founding." *Rocky Mtn. Gun Owners*, 121 F.4th at 116 (quoting *Heller*, 554 U.S at 581–82). But this rule includes just "weapons commonly used and possessed by law-abiding citizens for lawful purposes." *Id.* (citing *Heller*, 554 U.S. at 625, 627). Essentially, the Second Amendment protects "the right to carry common, lawful weapons but not 'dangerous and unusual' ones." *Id.* (quoting *Heller*, 554 U.S. at 627). And *Bruen* and *Rahimi* did nothing to alter *Heller*'s dangerous-and-unusual standard.

*United States v. Cousar*, No. 23-10004-01-EFM, 2024 WL 1406898, at *12 (D. Kan. Apr. 2, 2024) ("The Court is not persuaded that *Bruen* has meaningfully changed the 'dangerous and unusual common use' standard when it comes to interpreting the text of the Second Amendment."); *United States v. Rayton*, No. 24-cr-40045-TC, 2025 WL 901987, at *7 (D. Kan. Mar. 25, 2025) ("Yet there is nothing within [*Bruen* or *Rahimi*] to suggest a different result.").

Machineguns fit the *Heller* standard. *See Cousar*, 2024 WL 1406898, at *12 (collecting cases and noting "Courts of Appeals have uniformly found machineguns to be dangerous, unusual, and not in common use both before *Heller* and after *Heller*"); *Rayton*, 2025 WL 901987, at *7 (collecting cases).[4]  Machineguns are dangerous—they're akin to "pipe-bombs and hand-grenades[,]" which are "inherently dangerous." *Cousar*, 2024 WL 1406898, at *13 (citing *Staples v. United States*, 511 U.S. 600, 611–12 (1994)).  And they're unusual.  The government argues that there were about 176,000 legal machineguns in existence as of 2016—a figure the Fifth Circuit used to evaluate this question at that time.  Doc. 53 at 9 (citing *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016)).  Here, Mr. Isaac presents no alternative figure.  And, in any case, our court concluded just last year that 700,000 legally registered machineguns was a number "too insignificant for machineguns to be considered in common use." *See Cousar*, 2024 WL 1406898, at *13.  In so concluding, it noted that the 700,000 figure constitutes less than 0.2% of total firearms. *Id.*  Absent any argument from defendant on this point, the court follows the lead of other courts and concludes machineguns are unusual.

---

[4]       For example, see *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) (concluding machineguns "fall within the category of dangerous and unusual weapons that the government can prohibit for individual use"); *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 142 (3d Cir. 2016) ("[W]e repeat today that the Second Amendment does not protect the possession of machine guns.  They are not in common use for lawful purposes."); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (concluding machineguns are dangerous and unusual and explaining that "every circuit court to address the issue" had "held that there is no Second Amendment right to possess a machine gun").

So, machineguns are dangerous and unusual, not in common use for lawful purposes. Indeed, reading "the Second Amendment's plain text to cover machineguns is a reading that the *Heller* Court would have found 'startling.'" *Id.* (quoting *Heller*, 554 U.S. at 624).  Thus, the Second Amendment's text doesn't extend to possessing a machinegun.  *See id.* (holding § 922(o) is constitutional facially and as-applied, addressing just *Bruen*'s first prong); *Rayton*, 2025 WL 901987, at *8 (rejecting constitutional challenge to § 922(o) for failure to establish first *Bruen* prong).  Given this conclusion, the court needn't address *Bruen*'s second prong.  Mr. Isaac fails to satisfy *Bruen*'s first prong, so he hasn't shown § 922(o) is unconstitutional as applied.[5]

Mr. Isaac likewise fails to establish § 922(o) is unconstitutional facially.  "'A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.'"  *DeWilde v. Att'y Gen.*, No. 24-8071, 2025 WL 1637695, at *2 (10th Cir. June 10, 2025) (ellipses in original) (emphasis omitted) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  Mr. Isaac can't establish § 922(o) is unconstitutional facially if "at least some constitutional applications of the challenged statue exist."  *United States v. Cox*, 906 F.3d 1170, 1179 n.8 (10th Cir. 2018) (quotation cleaned up).  Because the court concludes § 922(o) is constitutional as applied to Mr. Isaac's alleged conduct, the statute's not unconstitutional in *all* of its applications.  Our Circuit recently reached a similar conclusion—albeit on different grounds—further solidifying that § 922(o) is constitutional facially.  *See DeWilde*, 2025 WL

---

[5]    The court recognizes, but distinguishes, a case where our court held § 922(o) unconstitutional. *See United States v. Morgan*, No. 23-10047-JWB, 2024 WL 3936767 (D. Kan. Aug. 26, 2024).  The court decided *Morgan* on *Bruen*'s second prong, not its first.  *Id.* at *5.  And the court decided *Morgan* before our Circuit had reiterated *Heller*'s "dangerous and unusual" standard, post-*Bruen*, in *Rocky Mountain Gun Owners*.  *See* 121 F.4th at 116–17 (explaining what "arms" encompasses); *see also United States v. Jones-Lusk*, No. CR-24-428-D, 2025 WL 44141, at *2 (W.D. Okla. Jan. 7, 2025) (disagreeing with *Morgan*, but noting the court ruled the issue before the Circuit decided *Rocky Mountain Gun Owners*).

1637695, at *2 (explaining that the Second Amendment protects just "bearable" arms and noting broad "machinegun" definition in 26 U.S.C. § 5845(b) extends to "both bearable weapons . . . and non-bearable weapons[,]" so statute isn't unconstitutional on its face).

At bottom, both of Mr. Isaac's constitutional challenges to § 922(o) fail. And so, Mr. Isaac's constitutional challenge provides no basis for the court to dismiss Count 1.

### D.    § 922(g)(1)

Mr. Isaac next argues the court must dismiss Count 2 of the Indictment because § 922(g)(1) is unconstitutional both facially and as applied to Mr. Isaac. Doc. 40 at 1. Section 922(g)(1) criminalizes possession for all felons, without distinction based on the nature of the underlying conviction or the danger posed. *Id.* at 9. Mr. Isaac argues, under the second *Bruen* prong, that § 922(g)(1)'s purpose and burden aren't supported by history and tradition. *Id.* at 16–17 (distinguishing the focus of § 922(g)(8), which requires a specific finding of dangerousness, from § 922(g)(1)); *id.* at 20–22 (referring to the statute "intentionally disarm[ing] those convicted of all felonies, regardless of any connection to rebellion, misuse of firearms, 'dangerousness,' or any other historically supported ground"). Mr. Isaac's constitutional challenge decries the statute's scope—which doesn't distinguish between the underlying convictions or danger posed in disarming permanently all felons.

But the court can resolve Mr. Isaac's challenge to § 922(g)(1) fairly quickly. After he filed the motion at issue here, the Tenth Circuit decided *Vincent v. Bondi*, 127 F.4th 1263 (10th Cir. 2025). And *Vincent* squarely reaffirms—in light of *Bruen* and *Rahimi*—that § 922(g)(1) is constitutional facially and as applied even to *nonviolent* offenders. *Id.* at 1265–66 (concluding earlier Tenth Circuit authority holding § 922(g) facially constitutional remained binding under *Bruen* and *Rahimi* and explaining "the Second Amendment doesn't prevent application of

§ 922(g)(1) to nonviolent offenders"); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (pre-*Bruen* case upholding constitutionality of § 922(g)). The Tenth Circuit explained that § 922(g)(1) is constitutional "for all individuals convicted of felonies"—it doesn't distinguish based on the type of felony involved. *Vincent*, 127 F.4th at 1266 (applying rule to nonviolent offender). The court thus rejects Mr. Isaac's argument that § 922(g)(1) is unconstitutional, both facially and as applied to him, a violent offender. *See* Doc. 1 at 2 (identifying Mr. Isaac's underling offense as armed robbery).

In sum, Mr. Isaac hasn't shown that the Indictment fails to state an offense. Both charged offenses—under § 922(o) and § 922(g)(1)—are constitutional. The court thus denies Mr. Isaac's Motion to Dismiss (Doc. 40).

## IV.    Motion to Dismiss Count 1 (Doc. 41)

Mr. Isaac's second Motion to Dismiss asks the court to dismiss Count 1 because ATF purportedly has "exceeded its authority" in classifying weapons and "is no longer afforded any *Chevron* deference." Doc. 41 at 8. He argues ATF lacked the authority to reclassify stand-alone auto sears as "machineguns" in ATF Ruling 81-4. *Id.* at 4. Mr. Isaac invokes *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), arguing the court can't defer to ATF's definition of a machinegun for purposes of § 922(o). *Id.* at 4, 8. And he likewise invokes *Garland v. Cargill*, 602 U.S. 406 (2024), to suggest that the court should find § 5845(b) doesn't encompass the item he allegedly possessed. *Id.* at 7–8. The government responds, arguing *Loper Bright* and *Cargill* are irrelevant here. Doc. 54 at 11 (emphasizing the court needn't rely on ATF's interpretation of a statute in this criminal case). And, the government emphasizes, Mr. Isaac is challenging prematurely the sufficiency of the government's evidence—whether it can prove the device Mr. Isaac allegedly possessed was a "machinegun." *Id.* at 8.

The court takes up the motion below, addressing the irrelevance of *Loper Bright* and *Cargill*, in turn, before evaluating Mr. Isaac's vagueness theory.

### A.    *Loper Bright*'s Irrelevance

Mr. Isaac's argument on this front is somewhat hard to follow.  He cites interesting cases—but none of them apply to his Motion to Dismiss.  In *Loper Bright*, the Supreme Court overturned *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), marking a seismic shift in administrative law.  *See Loper Bright*, 603 U.S. at 412–13.  Overruling the concept of *Chevron* deference, the Court concluded courts no longer automatically can defer to agency interpretations of ambiguous statutes.  *Id.*

*Loper Bright* is a civil case.  This one, of course, is a criminal case.  Mr. Isaac assumes that the court would rely on ATF's interpretation of "machinegun" in 26 U.S.C. § 5845(b).  And if the court did so, he'd be correct—*Loper Bright* forecloses the court from deferring to ATF's interpretation automatically.  But the court doesn't rely on the ATF's interpretation of "machinegun."  And the government doesn't even ask the court to do so.  At this stage, the case relies on the Indictment, which in turn relies on the statutory definition of a "machinegun" under 26 U.S.C. § 5845(b), not an ATF rule.

Rejecting an argument similar to the one Mr. Isaac asserts, the Eastern District of Michigan recently explained:

> The defendant correctly cites the evolving law, but it has nothing to do with the indictment in this case.  The charged offense is based on statutes enacted by Congress, not on agency interpretations.  There is no ambiguity that calls for an interpretive resolution, and the government seeks no deference to any agency interpretation, either through a regulation or agency letter.

*United States v. Johnson*, No. 24-20429, 2024 WL 4729467, at *9 (E.D. Mich. Nov. 8, 2024) (rejecting *Loper Bright*-based challenge to indictment under § 922(o)); *United States v. Moulton*, No. 24-CR-14031-GRAHAM, 2024 WL 5102816, at *2 (S.D. Fla. Dec. 13, 2024) ("The ATF's

opinion or interpretation of [§ 5845(b)] is of no consequence . . . . [N]either *Chevron* nor *Loper*

[*Bright*] applies to this [criminal] case."). This court agrees. *Chevron* deference—and *Loper*

*Bright*'s demolition of it—have no bearing on this case. And those cases aren't grounds to

dismiss Mr. Isaac's machinegun possession charge.

### B.    *Cargill*'s Irrelevance

Mr. Isaac's *Cargill*-based argument also is hard to follow. The court does its best to parse

through it, below.

Mr. Isaac's argument begins by claiming auto sears (also known as Glock switches) aren't

"designed and intended solely and exclusively for use in converting weapons into

machineguns[.]" Doc. 41 at 5. So, according to Mr. Isaac, an auto sear isn't a "machinegun"

under 26 U.S.C. § 5845(b). *Id.* He emphasizes that ATF has concluded auto sears *are*

machineguns under § 5845(b). *Id.* at 4 (citing ATF Ruling 81-4 that reclassified stand-alone auto

sears as "machineguns"). Later in his argument, Mr. Isaac supports his requested narrow reading

of § 5845(b) by citing *Cargill*. There, the Supreme Court rejected the notion that the § 5845(b)

definition of machinegun included firearms affixed with bump stocks, despite an ATF rule to the

contrary. *Cargill*, 602 U.S. at 414, 423 (evaluating Administrative Procedure Act challenge to

ATF final rule). Mr. Isaac addresses *Cargill*'s discussion of the presumption against

ineffectiveness[6] and argues that a § 5845(b) definition narrower than ATF's definition wouldn't

render the statute useless. *See* Doc. 41 at 7–8. And so, as a result, he argues the court should read

§ 5845(b) more narrowly than ATF does—to exclude auto sears. *See id.*

---

[6]    The presumption against ineffectiveness "weighs against interpretations of a statute that would render the law in a great measure nugatory, and enable offenders to elude its provisions in the most easy manner." *Cargill*, 602 U.S. at 427 (quotation cleaned up). Essentially, it's a "corollary to the commonsense proposition that Congress presumably does not enact useless laws." *Id.* (quotation cleaned up).

The court is puzzled by Mr. Isaac's argument and concludes it's no more than a red herring. The Indictment doesn't charge Mr. Isaac with possession of an auto sear on its own. It charges possession of a .40 caliber Glock pistol meeting the definition of a "machinegun."[7] Doc. 1 at 1. So, the court's not sure why an interpretation that "machinegun" under § 5845(b) doesn't include auto sears would justify dismissing the Indictment. The government, at trial, must prove the Glock pistol satisfies § 5845(b)'s definition of "machinegun." As a matter of law, a device is a "machinegun" if, for example, it fires more than one shot by a single function of the trigger. 26 U.S.C. § 5845(b). And to secure a conviction, the government needn't prove *also* that the device was converted into a machinegun by a part "designed and intended solely and exclusively" for that purpose. *See id.* (establishing independently sufficient definitions of "machinegun" by use of phrase "term shall also include"). That's just not the relevant question based on the device alleged in the Indictment. So, the court could reject Mr. Isaac's confusing *Cargill* argument on this basis alone. Mr. Isaac's request that the court construe "machinegun" to exclude auto sears, even if granted, wouldn't establish the government's inability to prove its case beyond a reasonable doubt. *See Chavez*, 29 F.4th at 1226 (explaining court may grant motion to dismiss only if "as a matter of law, the government is incapable of proving its case beyond a reasonable doubt" (quotation cleaned up)).

And even if the court were to evaluate the substance of Mr. Isaac's auto-sear argument, he essentially invites the court to decide facts—an invitation that plainly invades the jury's domain and one raised prematurely on a motion to dismiss. He suggests auto sears "are commonly sold as aftermarket accessories for Airsoft guns[.]" *Id.* at 5 (citing an online article that is no longer

---

[7]    Elsewhere, defendant explains that the Glock allegedly had an attached auto sear—also known as a "Glock switch." Doc. 41 at 7. But whether the government can prove the device at issue had a Glock switch in it and thus could fire more than one shot with a single pull of the trigger are fact questions improper for the court to resolve on a motion to dismiss.

available at the link provided).  So, he says, they aren't a part "designed *solely and exclusively* for

use in converting weapons into machineguns under 26 U.S.C. § 5845(b)."  *Id.* (emphasis in

original).  But even if the relevant question asked whether the alleged Glock switch on its own fits

the definition of a machinegun, that's "a question of fact that cannot be resolved 'without a trial

on the merits.'"  *Johnson*, 2024 WL 4729467, at *7 (quoting Fed. R. Crim. P. 12(b)(1))

(addressing somewhat similar *Cargill*-based argument concerning a § 922(o) indictment for a

weapon modified by a Glock switch); *Moulton*, 2024 WL 5102816, at *2 ("With appropriate

instructions, the jury would determine, based on the factual evidence, whether the functioning

Glock switch the Defendant allegedly possessed qualifies as a 'machinegun' under the law.");

*United States v. Alicea-Currás*, No. 22-511 (FAB), 2025 WL 559018, at *4 (D.P.R. Feb. 20,

2025) (concluding same argument isn't "properly before the Court on a motion to dismiss the

indictment" because it requires "either impermissibly assuming facts or weighing proffered facts

before trial" (brackets omitted)).

In sum, Mr. Isaac's *Cargill*-based argument fails on two independent fronts.  For one, the

court's not sure why Mr. Isaac wants the court to conclude a Glock switch—on its own—isn't a

machinegun.  He's charged with possession of a .40 caliber Glock pistol, not a "part" that

constitutes a "machinegun."  And for another, to reach Mr. Isaac's desired conclusion requires a

determination of fact necessarily left to a factfinder and improper on a motion to dismiss.

### C.    Void for Vagueness

Finally, Mr. Isaac appears to raise a constitutional vagueness argument about 26 U.S.C.

§ 5845(b).  Doc. 41 at 5 ("The term 'part' used in 26 U.S.C. § 5845(b) is unconstitutionally void

for vagueness.").  The government doesn't respond to this argument.  *See generally* Doc. 54.

But, as it turns out, Mr. Isaac's vagueness argument suffers a deficiency similar to his *Cargill*-based argument.

Mr. Isaac didn't specify whether he asserts a facial or as-applied challenge, *see generally* Doc. 41, nor is it entirely clear from the briefing, *id.* at 6 (arguing it's not "reasonably foreseeable" that "an aftermarket plastic rifle accessory on its own could constitute a machinegun" (quotation cleaned up)); *id.* at 7–8 (addressing the specific charged device and posing the question "What are the characteristics of a *part* of a machinegun?  Can a single bolt that is designed for use in a Glock switch be deemed a 'part' pursuant to 26 U.S.C. § 5845(d)?" (emphasis in original)).  But, in any case, Mr. Isaac can "only attack the statute as unconstitutionally vague on its face, if at all, after demonstrating that it is unconstitutional as applied to him."  *United States v. Uchendu*, No. 22-cr-00160-JNP-2, 2024 WL 757204, at *2 (D. Utah Feb. 23, 2024) (citing *United States v. Morales-Lopez*, 92 F.4th 936, 941 (10th Cir. 2024)).  So, the court evaluates whether Mr. Isaac has shown § 5845(b) is void for vagueness, as applied to his alleged conduct.

"[T]he Government violates [the Fifth Amendment's due process] guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 576 U.S. 591, 595 (2015).  Statutes "can be impermissibly vague for either of two independent reasons.  *First*, if [the statute] fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  *Second*, if [the statute] authorizes or even encourages arbitrary and discriminatory enforcement."  *United States v. Rodebaugh*, 798 F.3d 1281, 1295 (10th Cir. 2015) (emphasis added) (internal quotation marks and citation omitted).  One can't assert a successful vagueness challenge if the

statute "clearly applies" to his alleged conduct.  *Id.* (citing *Vill. of Hoffman Est. v. Flipside,*

*Hoffman Est., Inc.*, 455 U.S. 489, 495 n.7 (1982)); *Morales-Lopez*, 92 F.4th at 941 ("A plaintiff

who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the

law as applied to the conduct of others." (quotation cleaned up)); *United States v. Gumbs*, 16 F.

Supp. 3d 1292, 1300 (D. Kan. Apr. 21, 2014) (finding defendant couldn't win a vagueness

challenge on motion to dismiss indictment because "the statute clearly applies to the charges in

this case").

Mr. Isaac argues that a reasonable person couldn't determine "that an aftermarket plastic

rifle accessory *on its own*" constitutes a "machinegun." Doc. 41 at 6 (emphasis in original).

Recall, though, that the government doesn't charge Mr. Isaac with allegedly possessing an

"aftermarket plastic rifle accessory *on its own*[.]" *Id.* He's charged with possession of a .40

caliber Glock pistol that allegedly constitutes "a machinegun as defined in [§ 5845(b).]" Doc. 1

at 1. Mr. Isaac thus wasn't charged with possessing a "part" alone—the portion of the statue he

argues is vague. Whether the government can prove Mr. Isaac possessed the charged device, and

that the charged device qualifies as a "machinegun" under § 5845(b), are matters reserved for the

jury at trial. *See United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) ("Generally, the

strength or weakness of the government's case, or the sufficiency of the government's evidence

to support a charge, may not be challenged by a pretrial motion."); *United States v. Hoover*, 635

F. Supp. 3d 1305, 1320 (M.D. Fla. 2022) (explaining defendant's "challenge to whether the

conduct he engaged in constitutes a crime more accurately raises an issue of fact for resolution

by the jury—whether the device at issue constitutes a machinegun under § 5845(b)"). Mr.

Isaac's sole vagueness argument thus isn't about *his* conduct as alleged in the Indictment,

foreclosing an as-applied challenge.

"Rule 12 permits pretrial resolution of a motion to dismiss the indictment . . . when trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (internal quotation marks and citation omitted). Facts about Mr. Isaac's alleged offense wouldn't help the court determine the validity of his vagueness argument, because his argument doesn't focus on how the statute applies to his alleged offense. Mr. Isaac thus hasn't shown here that 26 U.S.C. § 5845(b) is unconstitutionally vague as applied to him. *Id.* at 1260 (courts can resolve motions that implicate the general issue, but that don't "require a trial because it focuses solely on the facts alleged in the indictment and their legal adequacy" (emphasis omitted)).

All three of Mr. Isaac's arguments—based on *Loper Bright*, *Cargill*, and vagueness— fail. Mr. Isaac hasn't shown that "as a matter of law, the government is incapable of proving its case beyond a reasonable doubt." *Chavez*, 29 F.4th at 1226 (quotation cleaned up). The court thus denies Mr. Isaac's Motion to Dismiss Count 1.

## V.    Conclusion

The court denies Mr. Isaac's Motion to Suppress (Doc. 42) because it concludes the law enforcement officers had probable cause to believe the Jeep Trackhawk contained evidence of crime. The officers knew Mr. Isaac was a prohibited person. And TFO Horine observed Mr. Isaac handling firearms, accessing the vehicle, and later leaving the parking lot without at least one of the spotted firearms. Because probable cause existed, the automobile exception to the warrant requirement applies.

The court also denies Mr. Isaac's Motion to Dismiss (Doc. 40). Neither 18 U.S.C. § 922(o) nor § 922(g) are unconstitutional facially, or as applied to Mr. Isaac. Tenth Circuit precedent forecloses all of Mr. Isaac's arguments in this motion.

Lastly, the court denies Mr. Isaac's Motion to Dismiss Count 1 (Doc. 41). *Loper Bright* and *Cargill* are irrelevant to this case's Indictment. And Mr. Isaac presents a fact question that the court can't resolve on a motion to dismiss. Also, Mr. Isaac hasn't established that 26 U.S.C. § 5845(b) is void for vagueness.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion to Suppress (Doc. 42) is denied.

**IT IS FURTHER ORDERED THAT** defendant's Motion to Dismiss the Indictment (Doc. 40) is denied.

**IT IS FURTHER ORDERED THAT** defendant's Motion to Dismiss Count 1 (Doc. 41) is denied.

**IT IS SO ORDERED.**

**Dated this 24th day of June, 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
