**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 23-20050-01-DDC |
| v. | |
| JOSEPH R. ISAAC (01), | |
| Defendant. | |

**MEMORANDUM AND ORDER**

The government indicted defendant Joseph R. Isaac for possessing a machine gun and possessing three guns after an earlier felony conviction.  A jury acquitted defendant of possessing the machine gun.  But it convicted defendant of possessing one of the other three firearms.  Defendant has moved for acquittal on that lone conviction, arguing the government failed to present sufficient evidence that he possessed the specific gun at issue on his felon-in-possession charge.  The court disagrees and thus denies this part of defendant's motion.

In the alternative, defendant argues that the government improperly and unfairly introduced evidence of another crime, entitling him to a new trial.  Specifically, the government accused defendant of using others to "straw purchase" guns and ammunition.  But here's the problem:  the government never gave defendant notice that it planned to introduce this evidence at trial, as Fed. R. Evid. 404(b)(3) requires.  On this score, defendant's right.  The government never provided notice of this evidence, rendering the evidence inadmissible.  The court concludes that this unnoticed evidence of prior bad acts denied defendant a fair trial.  The

interests of justice require that defendant receive a new one.  The court explains these conclusions, below, starting with the relevant background.

## I.        Background[1]

The government indicted defendant on two charges:  (1) possession of a machine gun and (2) possession of a firearm as a felon.  Specifically, Count 1 alleged that, on or about October 19, 2022, defendant possessed a machinegun:  a Glock .40 caliber pistol.  Doc. 102 at 1.  And Count 2 alleged that, on or about the same day, defendant possessed three specific guns:  (a) a Glock .40 caliber pistol, (b) a Romarm/Cugir 7.62x39mm caliber pistol, model Micro Draco, and (c) a Romarm/Cugir 7.62x39mm caliber pistol, model Mini Draco.  *Id.* at 2.

### *Rule 404(b)*

Pre-trial, the parties heavily litigated the government's use of other-acts evidence.  The government filed a dual-purpose document that:  (a) notified defendant of the government's plan to introduce other-acts evidence under Fed. R. Evid. 404(b); and (b) moved in limine for a preliminary ruling that this evidence was admissible.  *See generally* Doc. 78.  Highly summarized, the government's motion sought to admit an unspecified number of social-media photos and videos purportedly showing defendant with unspecified guns, taken at unspecified dates.  The court, unimpressed with the absence of specificity and concerned about the usefulness of this evidence, denied the government's motion.  *See generally* Doc. 84.

The government tried again.  *See generally* Doc. 88.  On take two, the government narrowed the universe of photos and videos it sought to admit.  And, invoking evidence terms with abandon, the government asserted that the evidence manifested defendant's knowledge,

---

[1]        The court draws most of this background from the trial evidence.  It recites only those facts necessary to decide the motion at hand.

opportunity, lack of mistake, and it asserted that the evidence—if admitted—would furnish a complete narrative. *Id.* at 10. The court denied this second motion in part and granted it in part. Doc. 114-4 at 1.[2]

The court rejected one video as extremely prejudicial, with little probative value and likely to confuse the jurors. *Id.* at 2. It also rejected the government's request to play videos in their entirety, limiting the government to certain screenshots. *Id.* at 3–5. But the court allowed the government to show images that were taken close in time to the conduct charged in the Indictment. *Id.* The court also required that any admitted images must show defendant with guns physically similar to those charged in the Indictment. *Id.* at 6. The court admitted this limited subset of images to show defendant's knowledge of the guns in the Indictment, consistent with *United States v. Moran*, 503 F.3d 1135 (10th Cir. 2007). In sum, the court tried to focus the evidence on the guns that the government elected to put in issue in the Indictment—a limitation the government repeatedly tested throughout the trial, and at its own peril.

The case then proceeded to a jury trial. The court summarizes the relevant parts of that trial, next, starting with the testimony of Officer Horine.

### *Officer Horine*

Horine worked on the ATF task force who investigated defendant. Doc. 130 at 41 (Tr. 41:9–17). As part of his role on the task force, Horine surveilled defendant's social-media accounts, spending hours looking through social-media posts. *Id.* at 43 (Tr. 43:1–9).

In October 2022, Horine received a call from another agent who just had seen defendant's vehicle—an easy-to-identify Jeep Trackhawk—in Kansas City, Kansas. *Id.* at 53–54, 56 (Tr. 53:20–54:7, 56:14–21). Horine located the distinctive Trackhawk and followed it to

---

[2] The parties announce that they can't find the court's second Rule 404(b) ruling on CM/ECF. Doc. 125 at 10 n.1; Doc. 134 at 5 n.2. It's captured in Doc. 114-4.

a townhome complex. *Id.* at 57 (Tr. 57:1–3). He parked some 150 yards away and got out his binoculars. *Id.* at 59, 62 (Tr. 59:9–13, 62:3–10). Horine saw defendant walk out of a townhome and get in the driver's side of the Trackhawk. *Id.* at 64 (Tr. 64:15–17). Horine testified that he then saw another man, Charlton Murphy, retrieve something from a vehicle parked next to the Trackhawk. *Id.* at 66 (Tr. 66:11–13). Horine testified that this something was an AK-style firearm. *Id.* (Tr. 66:14–16). Murphy then got into the passenger's side of the Trackhawk with the gun. *Id.* at 67 (Tr. 67:13–18). The Trackhawk left the townhome complex and drove to a house in Parkville, Missouri. *Id.* at 68, 74 (Tr. 68:19–22, 74:8–18). Horine testified that when he arrived at the Parkville house, he saw defendant leaving the house to return to the Trackhawk. *Id.* at 77 (Tr. 77:2–4). Horine didn't see defendant with a firearm. *Id.* (Tr. 77:12–16).

Defendant then drove back to the townhome complex in Kansas City, Kansas. *Id.* at 79 (Tr. 79:1–5). Horine again set up his surveillance, using the same position he had occupied the first time he watched the townhome complex. *Id.* at 79–80 (Tr. 79:25–80:3). Horine testified that he saw defendant get out of the Trackhawk, walk to the back of the SUV, and turn. *Id.* at 81 (Tr. 81:14–24). During this movement, Horine testified that he could see that defendant had a "black firearm in his right hand that resembles a . . . striker-filed pistol, such as a Glock-type firearm." *Id.* Horine claimed he had a direct line of sight and was "100 percent" certain the man he observed was the defendant. *Id.* at 82 (Tr. 82:9–20). This was the first time Horine saw defendant with a pistol. *Id.* at 210–11 (Tr. 210:23–211:4).

According to Horine, defendant then walked to the passenger side of the Trackhawk. *Id.* at 83 (Tr. 83:3–5). Horine testified that he peered through a narrow gap between the open front-passenger door and the car's body. *Id.* (Tr. 83:3–11). In that gap, he saw defendant handling a Mini Draco. *Id.* Horine explained that a Draco is an AK-style pistol. *Id.* (Tr. 83:12–14).

4

Horine believed this weapon was a different gun than the one Mr. Murphy had handled during the first townhome-complex surveillance because the guns were different colors, and the weapon he saw in defendant's hand had a muzzle attachment. *Id.* at 84 (Tr. 84:11–24). Horine later clarified that there are two types of Dracos: a Mini and a Micro. *Id.* at 86 (Tr. 86:5–17). Horine couldn't tell whether defendant had held a Mini Draco or a Micro Draco. *Id.* (86:20–24). Horine watched defendant handle the gun for a minute or two until he put the gun back in the passenger's side of the Trackhawk. *Id.* at 87–88 (Tr. 87:21–88:1).

Horine testified that, as he watched, people started to arrive at the townhome complex "with multiple firearms." *Id.* at 89–90 (Tr. 89:21–90:9). The group headed toward one of the townhomes, and Horine didn't see anyone else access the Trackhawk after defendant. *Id.* at 91 (Tr. 91:3–11). At this point, Horine believed that there were at least two guns in defendant's SUV—the pistol and the Draco. *Id.* at 92 (Tr. 92:7–11). According to Horine, two other agents, Olsen and Payne, requested a local police department to dispatch its special-operations unit to the townhome complex. *Id.* at 89, 90 (Tr. 89:12–16, 90:13–15). Horine watched as the officers from the special-operations unit broke the windows of the Trackhawk. *Id.* at 94 (Tr. 94:6–11).

Horine also testified about social-media photos. Through Horine, the government showed the jury several photos taken from an Instagram Reel showing defendant with Draco-style guns—but not the same Draco as the one found in the Trackhawk. *Id.* at 124–25, 126–27, 130, 132 (Tr. 124:19–125:7 (Ex. 22), 126:21–127:6 (Ex. 24), 130:8–16 (Ex. 25), Tr. 132:9–19 (Ex. 27)).

Defendant attacked Horine's credibility on cross-examination. The defense cross-examined Horine about details missing from his report—the presence of others besides defendant and Mr. Murphy, who closed the Trackhawk's door. *Id.* at 141 (Tr. 141:17–24). The defense

5

also painted Horine as a person who was obsessed with defendant.  *Id.* at 163 (Tr. 163:14–24); Doc. 132 at 99 (Tr. 599:3–7).  The defense argued that Horine couldn't possibly have seen the Trackhawk from his vantage point, as he had testified on direct.  Defendant suggested that a tree blocked Horine's view and that Horine couldn't see through a small gap in the open passenger's side door.  *See, e.g.*, Doc. 130 at 177–78 (Tr. 177:2–178:10); Doc. 132 at 102–03 (Tr. 602:11–603:24).  In closing, hoping to undermine Horine's credibility further, the defense pointed out that Horine had claimed to know the townhome-complex address because of the numbers on the building, but there weren't any numbers on the building.  Doc. 132 at 104 (Tr. 604:7–16).  The defense also noted that Horine had lost track of who had access to the Trackhawk when people started arriving at the townhome complex during Horine's second surveillance.  *Id.* at 104–05 (Tr. 604:20–605:4).

### *Payne*

James Payne, an agent with the Bureau of Alcohol, Tobacco, and Firearms, testified next. Doc. 130 at 222–23 (Tr. 222:24–223:1).  He testified that Horine had announced over the radio that he'd seen defendant with a firearm.  *Id.* at 230 (Tr. 230:8–14).  Based on Horine's surveillance, Payne had the local police dispatched to the scene, and one of the officers in that unit saw guns inside the Trackhawk.  *Id.* at 233–34 (Tr. 233:1–234:7).  Payne demanded that defendant, who was located inside one of the townhomes, unlock the Trackhawk.  *Id.* at 234–35 (Tr. 234:19–235:1).  And he warned defendant that they "would be recovering the firearms one way or the other[.]"  *Id.*  Payne gave defendant a few minutes to call an attorney, then decided that defendant had taken too long.  So, he busted the driver's side window to gain access to the Trackhawk.  *Id.* at 235–36 (Tr. 235:1–236:13).  Once officers had accessed the Trackhawk

6

through the broken window glass, an agent took the following photo of the Trackhawk's front

passenger seat:



Gov. Ex. 29. Payne testified that—starting on the left side of the photograph—the first gun was

an AK-type handgun. Doc. 130 at 238 (Tr. 238:13–16). The second gun, to the right of the first

and resting on its side, was also an AK-type handgun. *Id.* (Tr. 238:16–17). The third gun,

leaning against the middle console, was an AK-type gun. *Id.* (Tr. 238:18–19). And the fourth

gun (shown on the floorboard of the passenger's side of the Trackhawk) was a black

semiautomatic Glock handgun. *Id.* (Tr. 238:19–22). The government only charged defendant

with possessing three of the four guns, however. Payne also testified that all of the guns were

within the driver's reach. *Id.* at 240 (Tr. 240:23–25).

7

Payne identified the first gun—the one leaning against the passenger seat's backrest—as the Micro Draco charged in the Indictment. Doc. 131 at 12, 23 (Tr. 264:17–22, 275:9–17). Payne identified the second gun—the one lying flat on the seat cushion—as the Mini Draco. *Id.* at 17, 22–23 (Tr. 269:2–19, 274:22–275:5). And Payne testified that the fourth gun—the one shown on the floorboard of the passenger seat—had a machinegun-conversion device known as a Glock switch attached to the rear of the weapon's slide. Doc. 130 at 243 (Tr. 243:9–15); Doc. 131 at 22 (Tr. 274:1–12). The Glock provided the basis of the machine-gun charge in Count 1. And it also was one of the three guns charged on the felon-in-possession charge in Count 2 as well.

Payne testified that agents, after breaking the Trackhawk's window and taking photos, took the guns from the scene and processed them. Doc. 130 at 241 (Tr. 241:1–3). He also testified that the firearms were swabbed for DNA. *Id.* (Tr. 241:4–7).

Payne described the general process for swabbing firearms for DNA. *Id.* at 224 (Tr. 224:2–15). Payne testified that he was present for the swabbing of the guns in this case, but another agent, Olsen, did the actual swabbing. *Id.* at 224, 225 (Tr. 224:16–23, 225:12–17). Payne nonetheless testified that whoever swabbed the guns had followed the usual swabbing process. *Id.* at 224 (Tr. 224:16–19). The defense cross-examined Payne about appropriate swabbing methods—though, again, Payne testified that he didn't swab the guns. Doc. 131 at 26–27 (Tr. 278:4–279:3). Payne nonetheless wore gloves. *Id.* at 27 (Tr. 279:4–5). He couldn't recall if he changed gloves between retrieving the various firearms. *Id.* at 40–41 (Tr. 292:24–293:3). And Payne admitted that agents hadn't swabbed for DNA on two items shown in the above photo—the orange can of Gorilla spray glue and the juice container resting on the floorboard. *Id.* at 44–45 (Tr. 296:18–297:19).

*Olsen*

ATF agent Kris Olsen testified next. *Id.* at 67 (Tr. 319:7–9). Olsen testified about proper DNA swabbing procedures. *Id.* at 68–69 (Tr. 320:14–321:23). And he testified that he followed those procedures in this case—though he didn't have a specific memory of following these routines. *Id.* at 69–71 (Tr. 321:24–323:2). Olsen told the same version of the surveillance that Horine told. *See, e.g.*, *id.* at 77–79, 84 (Tr. 329:4–330:6, 330:22–331:12, 336:14–24).

When defendant went to the townhome complex a second time, Olsen joined the action as the local officers approached. *Id.* at 86 (Tr. 338:11–14). Olsen confirmed that Government Exhibit 29 (the photo shown above) showed the four guns as the guns were found in the Trackhawk. *Id.* at 92–93 (Tr. 344:15–345:6). Olsen testified that he helped Payne recover the guns from the car. *Id.* at 94 (Tr. 346:7–16). Olsen clarified that he didn't swab the firearms for DNA on the scene. *Id.* at 93 (Tr. 345:16–20). Instead, he swabbed them at the office. *Id.* at 93–94 (Tr. 345:19–346:6).

During Olsen's cross-examination, the defense used body-camera footage from the scene at the townhome complex to ask Olsen about Horine's line of sight. *See, e.g.*, *id.* at 161 (Tr. 413:10–24). The defense also asked Olsen about Payne's handling of the guns. *See, e.g.*, *id.* at 171 (Tr. 423:8–24).

*The Hill Brothers*

During the Olsen cross-examination, the defense played a portion of the body-camera footage captured during the townhome confrontation. The footage showed two men approaching the police officers. *Id.* at 173–74 (Tr. 425:22–426:3). Olsen identified the men as the Hill brothers. *Id.* at 174 (Tr. 426:14–16). The Hill brothers had purchased all four guns found inside the Trackhawk. *Id.* at 176–77 (Tr. 428:17–429:15).

Defense counsel also asked Olsen about a blue-and-white business card found during the inventory search of the Trackhawk. *Id.* at 182 (Tr. 434:7–10). Olsen testified that the business card came from Apex Armory. *Id.* (Tr. 434:11–12). Olsen testified that he went to Apex Armory and discovered that one of the Hill brothers had purchased ammunition and a Mini Draco there. *Id.* at 183–84 (Tr. 435:10–436:9).

On redirect, Olsen testified that he had investigated the Hill brothers. *Id.* at 207 (Tr. 459:11–13). The government then asked Olsen about "straw purchasing." *Id.* at 208 (Tr. 460:6–7). Olsen explained that straw purchasing occurs when someone who may purchase guns legally buys a gun for someone who cannot purchase a gun legally. *Id.* (Tr. 406:8–10). Olsen testified that the Hill brothers legally could purchase guns. *Id.* (Tr. 406:11–13). Olsen also testified that he'd visited Apex Armory, and the staff there had seen the Hill brothers and defendant present there—together—buying ammunition. *Id.* (Tr. 460:20–24). Olsen had investigated the Hill brothers from March 2021 to September 2022 as "potential firearms traffickers or straw purchasers." *Id.* at 209 (Tr. 461:8–16). During that time period, the Hill brothers bought 21 guns, all of which were "consistent with the firearms charged" in this action. *Id.* at 209–10 (Tr. 461:25–462:6). Olsen said that it was common for friends of felons to purchase guns for the felons and then pass the guns around. *Id.* at 210 (Tr. 462:7–16). Together, the government's evidence and Olsen's testimony implied that the Hill brothers had purchased the guns shown in the social-media photos showing defendant with firearms. *Id.* at 209–11 (Tr. 461:21–463:6).

On recross, the defense confirmed with Olsen that the government had investigated the Hill brothers but never indicted them for firearms trafficking or straw purchasing. *Id.* at 211–12 (Tr. 463:22–464:3).

The government, in its closing argument, brought up the Hill brothers again. The prosecutor asserted that the Hill brothers were straw purchasers of the guns found in the Trackhawk. Doc. 132 at 121 (Tr. 621:1–9). And the prosecutor referenced the business card for Apex Armory. *Id.* (Tr. 621:15–18). Specifically, he asserted "an individual that works there saw Mr. Isaac and the Hill brothers come in and the Hill brothers purchase ammunition. Is that consistent with them being straw purchasers? Of course it is." *Id.* (Tr. 621:18–21).

### *DNA Evidence*

The government's final expert was their DNA expert, Shannon Roberts. Roberts testified that the DNA found on the Micro Draco was a "partial major DNA profile" consistent with defendant's DNA profile. *Id.* at 22–23 (Tr. 522:20–523:1). For the Mini Draco, Roberts reached inconclusive results. *Id.* at 24 (Tr. 524:12–20). And for the Glock, Roberts discovered a "partial major DNA profile" consistent with defendant's DNA. *Id.* at 24–25 (Tr. 524:21–525:4).

On cross-examination, the defense asked Roberts about the different ways that humans shed DNA—*e.g.*, talking, breathing, sneezing, coughing, singing. *Id.* at 35 (Tr. 535:9–23). The defense also asked Roberts about DNA transfer. *Id.* at 37–38 (Tr. 537:20–538:1). Essentially, Roberts testified, any time two objects come into contact with one another, they transfer genetic material from one object to another. *Id.* at 38 (Tr. 538:2–16). So, a person can touch an item and transfer his DNA onto the object (called a primary transfer), then that item can touch another item and transfer the DNA to another item (called a secondary transfer). *Id.* at 38–39 (Tr. 538:22–539:6). Roberts also explained that when someone collects two samples without changing gloves in between taking the two samples, DNA material could transfer from the first item to the second item. *Id.* at 43 (Tr. 543:5–9). DNA testing, by itself, doesn't tell investigators how or when DNA material was transferred onto the object. *Id.* at 44 (Tr. 544:9–13).

### *Verdict*

The jury acquitted defendant on Count 1—possession of a machine gun.  Doc. 123 at 1. But it convicted defendant on Count 2.  *Id.*  Specifically, on Count 2, the jury found that defendant had possessed the Micro Draco.  *Id.* at 2.  The jury didn't find that defendant had possessed the two other guns shown in the photograph that is Exhibit 29:  the Glock .40 and the Mini Draco.  *Id.*

Defendant has moved for acquittal on Count 2 or, in the alternative, for a new trial.  Doc. 125.  The court begins with his request for acquittal.

## II.        Motion for Acquittal

Invoking Fed. R. Crim. P. 29, defendant moves for acquittal on his lone count of conviction.  *See generally id.*  He asserts that the government failed to present sufficient evidence to convict him of possessing the Micro Draco.  *Id.* at 3–6.  And, he argues, the jury reached an inconsistent verdict.  *Id.* at 6–7.  He also argues that the government's straw-purchaser theory—that the Hill brothers bought the guns for defendant—was unnoticed evidence of prior bad acts that led to the jury to draw impermissible inferences.  *Id.* at 7–8.  The court begins with the governing legal standard.

### A.        Legal Standard

To decide a Rule 29 sufficiency-of-the-evidence challenge, the court looks "at 'the evidence in the light most favorable to the government to determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt.'"  *United States v. Tao*, 107 F.4th 1179, 1184 (10th Cir. 2024) (quoting *United States v. Johnson*, 821 F.3d 1194, 1201 (10th Cir. 2016)).  When conducting this review, the court doesn't "decide credibility issues or reweigh the evidence."  *Johnson*, 821 F.3d at 1201.  "The only question is 'whether the government's evidence, credited as true, suffices to establish the elements of the crime.'"  *Id.* (quoting *United States v. Hutchinson*, 573 F.3d 1011, 1033 (10th Cir. 2009)).

A Rule 29 acquittal is appropriate where "the evidence does no more than raise a mere suspicion of guilt or requires piling inference upon inference to conclude the defendant is guilty[.]" *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015) (quotation cleaned up). "While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable." *Id.* (quotation cleaned up). Indeed, "the evidence presented to support a conviction must be substantial." *Id.* (quotation cleaned up).

"An inference is unreasonable if it requires the jury to engage in a degree of speculation and conjecture that renders its findings a guess or mere possibility." *United States v. Goldesberry*, 128 F.4th 1183, 1192 (10th Cir. 2025) (quotation cleaned up). "Speculation and conjecture" occur when a reasonable fact-finder is "left . . . with a number of equally reasonable inferences[.]" *Id.* at 1195 n.7 (quotation cleaned up). "Any inference must be made beyond a reasonable doubt if it goes to an ultimate conclusion underpinning criminal liability, *e.g.*, satisfying an element of a crime necessary for conviction." *Id.* at 1192–93 (quotation cleaned up).

## B.    Analysis

With this legal standard firmly in mind, the court, as a threshold matter, rejects one of defendant's grounds for acquittal. Defendant argues that the evidence about the Hill brothers purchasing guns for defendant caused the jury to speculate and infer improperly that the Hill brothers bought the guns found in the Trackhawk on the day in question. Doc. 125 at 7–8. But this kind of argument isn't proper fodder for acquittal. Our Circuit has held that arguments about "improperly admitted . . . testimony" are "not a proper basis for a Rule 29(a) motion." *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994). There's "only one ground for a motion for a judgment of acquittal." 2A *Wright & Miller's Federal Practice & Procedure* § 466 (4th ed.

13

2026).  And that one ground requires a finding "that 'the evidence is insufficient to sustain a conviction' of one or more of the offenses charged in the indictment[.]"  *Id.* (quoting Fed. R. Crim. P. 29(a)).  Defendant's argument based on the Hill brothers is about *improper* evidence, not *insufficient* evidence.  The court thus considers this argument in its new-trial analysis under Fed. R. Crim. P. 33—not in its acquittal analysis under Fed. R. Crim. P. 29.  Pocketing that argument for now, the court turns to the analysis of the sufficiency of evidence for defendant's conviction for possessing the Micro Draco found in the Trackhawk.

Defendant wasn't the sole occupant of the Trackhawk.  Mr. Murphy rode along.  So the government needed to "show some nexus between Defendant and the firearm that supports a plausible inference that the defendant had knowledge of and access to the weapon or contraband."  *United States v. Samora*, 954 F.3d 1286, 1291 (10th Cir. 2020) (quotation cleaned up).  Three pieces of evidence tie defendant to the Micro Draco:  Horine's testimony; the presence of the gun in defendant's car; and the DNA evidence.

Horine testified that he saw defendant possess an AK-47-style pistol, though he couldn't be sure whether it was a Micro Draco or a Mini Draco.  Defendant argues that this testimony required the jury to "guess as to which firearms Detective Horine observed because Detective Horine did not know which firearm he saw."  Doc. 125 at 4.  The problem with this argument is the DNA evidence.

The DNA evidence provided a basis for the jury properly to infer that Horine saw defendant holding that Draco.  It did that by showing that the Micro Draco had a "partial major DNA profile" consistent with defendant's DNA profile.  Doc. 132 at 22–23 (Tr. 522:20–523:1).  What's more, as shown in the photo exhibit reproduced above, the Micro Draco was within easy reach of the driver's seat—unlike the Glock, which was on the floorboard.  The DNA evidence

14

and the location of the Micro Draco provided sufficient evidence for a rational jury to conclude that defendant had possessed the Micro Draco. *See Samora*, 954 F.3d at 1291 (concluding government presented sufficient evidence of possession of firearm where firearm was found in car's center console, not floorboard, and government had DNA evidence).

Defendant resists this conclusion by trying to conjure doubt about the DNA evidence. He points out that the DNA expert couldn't say how defendant's DNA ended up on the Micro Draco. Doc. 125 at 4. And, he argues, other cases had relied on DNA evidence showing that the defendant had *handled* the gun. But here, defendant emphasizes, the DNA expert here never testified that defendant likely handled the relevant guns. *Id.* at 4–5 (first citing *Samora*, 954 F.3d at 1290; and then citing *United States v. Sanchez*, No. 23-2037, 2024 WL 3336319, at *5 (10th Cir. July 9, 2024)). Defendant's argument is a reasonable one, and defendant was free to argue this theory at trial hoping to cast doubt on the government's DNA evidence. But the court must view the evidence in the light most favorable to the government. *Tao*, 107 F.4th at 1184. And a rational jury reasonably could infer that a partial major DNA profile on the gun meant that defendant had handled it—had possessed the gun. Indeed, Olsen testified that he swabbed the trigger, grip, and slide or charging handle because those "are the areas of the firearm that people handle, that they manipulate when using the firearm." Doc. 131 at 98 (Tr. 350:20–22).

Trying to sew more DNA doubt, defendant points out that the government's expert explained in her testimony how DNA can end up on an object without someone touching the object—*i.e.*, shedding DNA, a secondary transfer, or improper collection. Doc. 125 at 5. Defendant cites the government's failure to swab everything in the Trackhawk—the can of glue, the juice container, etc.—to determine if DNA was transferred from those objects to the guns. *Id.* And he makes much of video footage of Payne touching the Trackhawk's surfaces before

15

collecting the guns. *Id.* at 6. Again, reasonable arguments all. But the standard of review dooms them. Defendant was free to argue to the jury that DNA ended up on the Micro Draco through some means other than defendant possessing the weapon. But the jury equally was free to reject this theory of the evidence. Perhaps the DNA transferred to the Micro Draco from the car seat. Or perhaps the DNA transferred to the Micro Draco from defendant possessing it—a reasonable inference, given that the Micro Draco was readily accessible from the driver's side. And construing the evidence in the light most favorable to the government, Horine testified that he spotted defendant with the Micro Draco.

Defendant also argues for acquittal because the jury's verdicts were inconsistent. Doc. 125 at 6–7. That is, he argues that Horine claimed he saw defendant with the Glock, and Roberts claimed a DNA match on the Glock—yet the jury rejected this evidence. But it "is well-settled in our circuit that 'an inconsistent verdict is not a sufficient reason for setting a verdict aside.'" *United States v. Battles*, 745 F.3d 436, 454 (10th Cir. 2014) (quoting *United States v. Irvin*, 682 F.3d 1254, 1271 (10th Cir. 2012)).

The court thus denies the first part of defendant's motion. The trial evidence sufficed for a reasonable jury to convict defendant on Count 2, so the court can't set aside its verdict and thereby acquit defendant on that charge. The court moves next to the second half of defendant's motion—the part seeking a new trial on Count 2.

## III.    New Trial

Defendant argues that he deserves a new trial for two reasons. *First*, the court allowed the government to present evidence of defendant's prior possession of a firearm for a limited purpose—*i.e.*, to show defendant's knowledge—but the government used this evidence for purposes well beyond this purpose. Doc. 125 at 9–10. *Second*, during Olsen's redirect, the government introduced evidence of defendant using the Hill brothers to purchase guns. Yet the

16

government never disclosed any reports to the defense suggesting that anyone had investigated defendant for illegal firearms trafficking. Nor did the government include this information in its Rule 404(b) notice. The court evaluates these arguments, in turn, below. This evaluation begins with the governing legal standard.

### A.    Legal Standard

Fed. R. Crim. P. 33 authorizes the court to grant a motion for a new trial "if the interest of justice so requires." The Rule "recognizes that if a trial court concludes for any reason that the trial has resulted in a miscarriage of justice, the court has broad powers to grant a new trial." 3 *Wright & Miller's Federal Practice and Procedure* § 581 (4th ed. 2026). But a motion for new trial is granted "with great caution." *United States v. Herrera*, 481 F.3d 1266, 1269–70 (10th Cir. 2007); *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999). "The defendant has the burden of proving the necessity of a new trial." *United States v. Walters*, 89 F. Supp. 2d 1206, 1213 (D. Kan. 2000). The decision whether to grant a motion for new trial is committed to the trial court's sound discretion. *See United States v. Cesareo-Ayala*, 576 F.3d 1120, 1126 (10th Cir. 2009); *Herrera*, 481 F.3d at 1270; *Quintanilla*, 193 F.3d at 1146.

### B.    Analysis

Defendant's motion for a new trial hinges on evidence about the Hill brothers straw purchasing guns and ammunition for defendant. Defendant argues that this evidence was un-noticed Rule 404(b) evidence. Yet defendant didn't object—contemporaneously—to this evidence on Rule 404(b) grounds. *See* Doc. 131 at 207–211 (Tr. 459:7–463:17). "Because there was no contemporaneous objection and the issue is raised for the first time in a motion for new trial, the court finds the plain error analysis of Rule 52(b), Fed. R. Crim. P., applies." *United States v. Mayes*, 606 F. Supp. 3d 1127, 1130 (W.D. Okla. 2022); *see also* 3B *Wright & Miller's Federal Practice & Procedure* § 851 (4th ed. 2026) (explaining that Fed. R. Crim. P. 52 "applies

17

to both the trial court and the appellate courts" and "the standards it sets out are controlling when a trial court is passing on a post-trial motion").

Plain-error review consists of four prongs. Defendant "must show (1) an error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Herrera*, 51 F.4th 1226, 1248 (10th Cir. 2022) (quotation cleaned up). The court starts with the first two components.[3]

Admitting the un-noticed Rule 404(b) evidence was error. The government never disputes that the evidence about straw purchasing is Rule 404(b) evidence. *See generally* Doc. 134. The court thus safely can assume that this is the theory under which the government sought to admit the evidence. *See id.* at 5 ("The Government properly admitted 404(b) evidence at trial."). And while Rule 404(b) evidence was litigated heavily before trial, the government never provided the defense with notice disclosing this straw-purchaser evidence. *See* Doc. 76; Doc. 88.[4]

---

[3]    One reasonably might argue that defendant has forfeited this argument by failing to argue for plain error. *See Untied States v. Roach*, 896 F.3d 1185, 1192 (10th Cir. 2018). "Nevertheless, because the government did not raise this preservation issue, [the court] consider[s] the merits." *United States v. Asbill*, No. 24-7052, 2025 WL 2525760, at *6 n.4 (10th Cir. Sept. 3, 2025). That is, because the government engages with the merits of defendant's argument, the court follows suit. *See Sharpe-Miller v. Walmart, Inc.*, No. 24-2055, 2026 WL 2015375, at *8 (10th Cir. July 13, 2026) (published) (explaining that the Circuit "ordinarily" doesn't raise "questions of waiver and forfeiture" sua sponte because it "is the parties' role to raise and brief the issues for decision" and considering waived argument on the merits after opponent waived the waiver). And even if an argument is forfeited, the court retains discretion to consider it. *See Ave. Cap. Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 886 (10th Cir. 2016). Here, the parties' papers contain all the necessary pieces for a plain-error analysis. So, the court exercises its discretion to consider the merits of defendant's argument and puts those pieces together itself.

[4]    The government never argues that the straw-purchaser evidence is intrinsic evidence. *See generally* Doc. 134. And rightly so. Had the government limited its straw-purchaser evidence to the guns charged, one could argue that the evidence was "directly connected to the factual circumstances of the crime" and thus intrinsic. *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009) (quotation cleaned up). But, continuing a pattern used throughout this trial, the government went well beyond the charges in this case. They introduced evidence that tied defendant to a straw-purchasing scheme involving 21 firearms. That's extrinsic evidence. *See* Doc. 84 at 5–8 (declining to admit evidence of prior gun possession as intrinsic to charges here).

18

The government insists that it didn't violate Rule 404(b) because it "did not inquire or elicit information about the Hill brothers purchasing firearms for Defendant in its direct examination of any witness." Doc. 134 at 6. Instead, the government explains, the defense opened the door to this evidence by asking Olsen on cross about the Hill brothers' ownership of the guns. *Id.* at 6–8. But the government cites no authority—zero—for the proposition that its Rule 404(b) obligation extends only to direct-examination material. *See generally id.* Perhaps that's because the law won't abide it. Rule 404(b) "requires the prosecution to provide notice, regardless of how it intends to use the extrinsic act evidence at trial, i.e., during its case-in-chief, for impeachment, or for possible rebuttal." Fed. R. Evid. 404(b) advisory committee's note to 1991 amendment. In short, it just doesn't matter who opened the door or when. If the government ushers 404(b) evidence into evidence—and it did so here—the government must provide notice to defendant. It didn't. Admitting the evidence was error.

This error was a plain one. Our Circuit has held that if "the government does not comply with the notice requirement of Rule 404(b) after a request by the accused, the offered evidence is inadmissible." *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1241 (10th Cir. 1996). "Because the notice requirement serves as condition precedent to admissibility of 404(b) evidence, the offered evidence is inadmissible if the court decides that the notice requirement has not been met." Fed. R. Evid. 404(b) advisory committee's note to 1991 amendment. True, a "district court may excuse pretrial notice and admit such evidence on good cause shown." *Lopez-Gutierrez*, 83 F.3d at 1241. But here, the government never tries to demonstrate good cause for its failure to disclose. Take *Lopez-Gutierrez* as an example. The district court there found—and the Circuit agreed—that the government had shown good cause for its late disclosure "because the evidence was not made available to the government until the night before trial during an

19

interview with" the witness. *Id.*  But there's nothing like that here.  What's more, Olsen was one of the government's main witnesses.  The court can't discern how the government could've learned about Olsen's testimony at such a late hour.  The court thus concludes that the first two prongs of plain error are satisfied.

At prong three, defendant must establish that the error affected his substantial rights.  To show "that an error affected a defendant's substantial rights, a defendant generally must demonstrate that an error was prejudicial, meaning that there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Starks*, 34 F.4th 1142, 1157 (10th Cir. 2022) (quotation cleaned up).  This third "prong does not require a defendant to 'prove by a preponderance of the evidence that but for error things would have been different'—instead, the defendant must show that the claimed error is 'sufficient to undermine confidence in the outcome.'" *United States v. B.N.M.*, 107 F.4th 1152, 1170 (10th Cir. 2024) (quoting *Starks*, 34 F.4th at 1157).

Defendant calls the straw-purchaser evidence "highly prejudicial other acts evidence." Doc. 135 at 4.  He's right.  Through Olsen, the government (a) defined straw purchasing, (b) directly tied defendant to the Hill brothers' purchase of ammunition at Apex Armory, (c) described investigating the Hill brothers for firearms trafficking and straw purchasing, (d) mentioned the Hill brothers' purchase of 21 firearms, (e) tied those 21 firearms to defendant and this case, and (f) implied that the Hill brothers had passed firearms off to defendant, including the guns shown in social-media photos of defendant holding firearms.  Doc. 131 at 208–11 (Tr. 460:6–463:15).  All told, the government accused defendant of participating in an illegal firearms-trafficking conspiracy with the Hill brothers.  And yet the government never charged the Hill brothers or defendant with such conduct.  Admitting this un-noticed other-acts evidence

20

undermines the court's confidence in the trial's outcome because of the nature of other-acts evidence, its effect on defense strategy, and the evidence was heavily contested at trial.

Start with the nature of other-acts evidence. The Supreme Court long has recognized that "the introduction of evidence of a defendant's prior crimes risks significant prejudice." *Almendarez-Torres v. United States*, 523 U.S. 224, 235 (1998). Evidence of prior bad acts "is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 476 (1948). Recognizing these concerns, our Circuit has held that "[e]vidence of prior criminal acts is almost always prejudicial to the defendant." *United States v. Shepherd*, 739 F.2d 510, 513 (10th Cir. 1984). That's why the Circuit orders district courts to conduct a Rule 403 balancing before admitting other-acts evidence. *See United States v. Davis*, 636 F.3d 1281, 1297 (10th Cir. 2011). And if the court admits the evidence, our Circuit requires districts courts to instruct the jury, upon request, "that evidence of similar acts is to be considered only for the proper purpose for which it was admitted." *Id.* (quotation cleaned up). No Rule 403 balancing ever occurred with this evidence—a serious problem, given the court's prior concerns about prejudice, juror confusion, misleading the jury, and wasting time. *See* Doc. 84 at 14 (denying government's first motion to admit evidence of defendant's prior firearm possession because the evidence was highly prejudicial, risked confusing and misleading the jury, and would have wasted time). Nor did the court get the chance to cure any prejudice by giving a limiting instruction about this evidence.

Defendant also has shown that the lack of notice affected his trial strategy. To start, there's no way defendant could've learned about this evidence before Olsen testified. Defendant represents that he received, before trial, two reports: one reflecting law enforcement's

21

investigation of the Hill brothers' firearms purchases, and one reflecting the Apex Armory ammunition purchase. Doc. 135 at 2. But neither of those reports suggested that the Hill brothers served as straw purchasers for any of the guns found inside the Trackhawk or the guns shown in social-media photos. *See id.* at 2–3. Nor do those reports tie the Hill brothers' other purchases of guns to this case's defendant. *See id.* The government insists that it disclosed all investigated reports and evidence to the defense in their entirety. Doc. 134 at 8. And the court accepts the government's representation on this point.

But all this means that the defense had no clue—neither from evidence disclosed pretrial nor from a Rule 404(b) notice—that the government had tied defendant to the Hill brothers' straw purchasing of guns found in the Trackhawk (or shown in the social-media photos of defendant at a shooting range). The first time that this narrative emerged was when the prosecutor raised it on Olsen's redirect. In short, the defense had no way to know that it was opening the door to this evidence. *See* Doc. 135 at 4. As a result, the defense's claim that it was surprised by this evidence is credible. *See, e.g.*, *id.* ("From everything the government disclosed to Mr. Isaac, his case was always only about his illegal possession of firearms.").

And this surprise prejudiced defendant. He logically claims he might not have opened the door to evidence about the Hill brothers had he known what was coming. *Id.* Because the court can imagine a world in which the defense would decline to open the door to highly prejudicial evidence, the court finds a reasonable probability that, in that world, the trial result could've gone differently. *See United States v. Vega*, 188 F.3d 1150, 1155 (9th Cir. 1999) (finding admission of un-noticed Rule 404(b) evidence harmful error because lack of notice prejudiced defense's trial strategy, which "could not adequately address other acts evidence" without time to investigate other acts nor prepare for cross examination); *see also United States*

22

*v. Carrasco*, 381 F.3d 1237, 1241 (11th Cir. 2004) (finding un-noticed Rule 404(b) evidence prejudiced defendant's trial strategy).[5]

That's particularly so because of the hotly contested evidence in the case. The government's evidence wasn't overwhelming. And no part of the government's case went uncontroverted at trial. The defense undermined Horine's credibility, injected doubt about the DNA evidence, and highlighted chain-of-custody issues. As already mentioned, Horine admitted that he couldn't tell which Draco he saw defendant holding in his hand. The defense also cast doubt on the DNA evidence. Indeed, the jury didn't convict defendant of possessing the Glock .40 and the Mini Draco. So, some of defendant's efforts struck oil. Had the un-noticed evidence about the Hill brothers not come into evidence, things might have gone differently. There's more. The jury asked a question that referenced "a felon walking into a gun store[.]" Doc. 117 at 1. This question invokes Olsen's testimony about defendant purchasing ammunition at Apex Armory with the Hill brothers. In the court's view, this jury question provides a barometer that helps gauge the importance of the un-noticed Rule 404(b) evidence.

In sum, nothing about this trial was straightforward, and, given how close the case was, the government's unfair advantage "is sufficient to undermine confidence in the outcome." *B.N.M.*, 107 F.4th at 1170 (quotation cleaned up). The court thus concludes that defendant has satisfied the third prong of plain error by showing that the Rule 404(b) evidence and lack of notice caused prejudice.

---

[5]     The defense accuses Olsen of intentionally misleading the jury. Doc. 135 at 5. The court doesn't know that Olsen did so, and it doesn't suggest he did so. But, given that the court accredits the government's statement that all reports were disclosed to the defense, the court wonders how Olsen connected defendant to the Hill brothers' gun purchases. Had the government made the requisite Rule 404(b) notice and thus provided defendant notice that the government would accuse defendant of such involvement, the defense could have prepared to cross-examine Olsen about the lack of evidence for his opinion.

At the final plain-error prong, defendant must show that the error seriously affected the fairness, integrity, or public reputation of his judicial proceedings. This one's easier. It was unfair for the government to fail its Rule 404(b) obligations. The government appears to have waited for the defense to open the door and then pounced on redirect with evidence of those prior acts. When confronted with the issue, the government never explains how it happened. This silence affects the court's view of the trial's intrinsic integrity. The court urged the government—multiple times—to focus its case. Yet the government ignored the court's concerns. And, in so doing, it created a perfect storm for plain error to arrive.

To sum up, the government's unexplained failure to comply with its Rule 404(b) obligations and the admission of highly prejudicial evidence in a close case has resulted in a miscarriage of justice. The government must play by the rules. It didn't do so here. The court thus concludes that this case is one of those rare cases requiring a new trial.

## IV. Conclusion

The court denies defendant's request to acquit him on Count 2. But it grants him a new trial on the charge. The court will convene a status conference in the case on Tuesday, August 18, 2026, at 1:30 P.M.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Joseph R. Isaac's Motion for Judgment of Acquittal, or Alternatively for a New Trial (Doc. 125) is granted in part and denied in part.

**IT IS SO ORDERED.**

**Dated this 7th day of August, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
